[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 13-14953
_____

D.C. Docket No. 1:11-cv-23983-MGC


NELSON J. MEZERHANE,

Plaintiff - Appellant,

versus

REPÚBLICA BOLIVARIANA DE VENEZUELA,
a sovereign nation,
SUPERINTENDENCIA DE LAS INSTITUCIONES DEL SECTOR BANCARIO,
an agency or instrumentality of the Bolivarian Republic of Venezuela,
FONDO DE PROTECCIÓN SOCIAL DE LOS DEPÓSITOS BANCARIOS,
an agency or instrumentality of the Bolivarian Republic of Venezuela,
et al.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(May 7, 2015)

Before HULL, JULIE CARNES, and WALKER,[*] Circuit Judges.

WALKER, Circuit Judge:

Plaintiff Nelson Mezerhane appeals the district court's order dismissing his international human rights law complaint for lack of subject matter jurisdiction. In claims against Venezuela and two Venezuelan governmental entities, Mezerhane alleges that the Venezuelan government committed various torts and statutory violations against him. The district court held that the defendants were entitled to sovereign immunity under the Foreign Sovereign Immunities Act (FSIA), but Mezerhane argues that this was error because the FSIA's exception for cases "in which rights in property taken in violation of international law are in issue" applies. 28 U.S.C. § 1605(a)(3). We agree with the district court and conclude that, under the domestic takings rule, no violation of international law occurred for FSIA purposes because the alleged takings affected a foreign country's own national and took place on that country's soil. We also agree with the district court that the act of state doctrine provides an additional basis to dismiss Mezerhane's claims. Accordingly, we affirm the district court's decision.

---

[*] The Honorable John M. Walker, Jr., United States Court of Appeals for the Second Circuit, sitting by designation.

2

## BACKGROUND

On November 4, 2011, Mezerhane filed a seventeen-count complaint against República Bolivariana de Venezuela ("Venezuela"), Superintendencia de las Instituciones Del Sector Bancario ("SUDEBAN"), and Fondo de Protección Social De Los Depósitos Bancarios ("FOGADE"), as well as a number of additional Venezuelan agencies and instrumentalities.[1] SUDEBAN and FOGADE are both Venezuelan government entities. Mezerhane alleges that the defendants engaged in a pattern of persecution against him that included numerous violations of human rights law, expropriation of his property in violation of international law, and other tortious acts. He asserts common law tort claims and claims under the Alien Tort Claims Act and the Torture Victim Protection Act of 1991. As we must at the pleading stage, we take Mezerhane's factual allegations to be the operative facts. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 572 (2007) ("[A] judge ruling on a defendant's motion to dismiss a complaint must accept as true all of the factual allegations contained in the complaint." (internal quotation marks omitted)).

Mezerhane is a successful Venezuelan entrepreneur who ran a number of businesses in that country, including the bank Banco Federal, C.A., the newspaper Diario El Globo, and the television channel Globovisión Tele, C.A. His media

---

[1] Only Venezuela, SUDEBAN, and FOGADE are parties to this appeal.

outlets were "editorially independent entities, providing a counter-point to the state-run networks."

Beginning in 2004, during Hugo Chavez's term as president of Venezuela, the government targeted Mezerhane to gain control over his media companies. President Chavez himself called Mezerhane to try to persuade him to relinquish his interest in Globovisión to the government. When Mezerhane refused, President Chavez retaliated against him first by attacking him in public speeches, and later by expropriating his and his family's assets through illegitimate judicial proceedings. All of this caused Mezerhane to suffer damages in excess of $1 billion.

The Venezuelan government also accused Mezerhane of playing a role in connection with the murder of a Venezuelan prosecutor. In 2005, after learning that he was being sought and voluntarily surrendering to Venezuelan authorities, Mezerhane was arrested and incarcerated for 37 days. In December 2005, Mezerhane was released on bail and he filed an action with the Inter-American Commission on Human Rights for false imprisonment and human rights abuses. Mezerhane says he was "branded an outlaw," and was the victim of "egregious" defamation.

Mezerhane also states that he was stripped of "all indicia of citizenship," including the rights to travel in and outside of Venezuela, "to live in a non-

incarcerated state in Venezuela," to "earn a livelihood," and to acquire, sell, and convey property. As a result of these actions, Mezerhane claims that he is *de facto* stateless. He is currently seeking asylum in the United States.

On October 23, 2012, Venezuela and SUDEBAN jointly moved to dismiss Mezerhane's complaint claiming sovereign immunity under the FSIA, 28 U.S.C. §§ 1602-11. On October 26, 2013, FOGADE filed a separate motion to dismiss on the same ground.

Mezerhane's complaint treats Venezuela as a "foreign state" for purposes of the FSIA and treats SUDEBAN and FOGADE as "agenc[ies] or instrumentalit[ies] of a foreign state" under 28 U.S.C. § 1603(b). The complaint asserts that the district court has personal jurisdiction over SUDEBAN and FOGADE based on their commercial activities in the United States.

On December 30, 2013, the district court (Marcia G. Cooke, J.) issued an opinion granting the motions to dismiss on the bases that the district court lacked subject matter jurisdiction over Mezerhane's claims because defendants are entitled to immunity under the FSIA and that the claims are barred by the act of state doctrine.

Mezerhane now appeals.

## **DISCUSSION**

### I.    **Legal Standard**

We review *de novo* a district court's conclusion that a defendant is entitled to sovereign immunity under the FSIA. *Venus Lines Agency v. CVG Industria Venezolana De Aluminio, C.A.*, 210 F.3d 1309, 1311 (11th Cir. 2000). "If sovereign immunity exists, then the court lacks both personal and subject matter jurisdiction to hear the case and must enter an order of dismissal." *de Sanchez v. Banco Cent. De Nicaragua*, 770 F.2d 1385, 1389 (5th Cir. 1985). We also review *de novo* the applicability of the act of state doctrine to Mezerhane's claims against Venezuela. *See Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006).

### II.    **The Foreign Sovereign Immunities Act**

Mezerhane asserted federal jurisdiction over Venezuela, and its instrumentalities SUDEBAN and FOGADE, through the FSIA, §§ 1602-11.  The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989). The Act provides that "a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1286  (11th Cir. 2005) (citation and internal quotation marks omitted); *accord* 28 U.S.C. § 1604. Accordingly, if no

6

statutory exception applies, the district court lacks subject matter jurisdiction. *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 489 (1983); *S & Davis Int'l, Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1300 (11th Cir. 2000).

Mezerhane argues that defendants should be denied immunity here because this case does fall within an exception to the FSIA's general grant of immunity. He relies on 28 U.S.C. § 1605(a)(3), which provides that immunity does not apply in any case "in which rights in property taken in violation of international law are in issue."[2]

Mezerhane argues that the alleged confiscations violated treaty-based "human rights law" and thus violated international law under 28 U.S.C. § 1605(a)(3). He cites four treaties—the American Convention on Human Rights ("the American Convention"); the U.N. Convention on the Status of Refugees; the Treaty of Peace, Friendship, Navigation and Commerce between the United States

---

[2] The entire subsection reads:

> (a)  A foreign state shall not be immune from the jurisdiction of courts of the United States…in any case—
>
> (3)  in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States  by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States….

28 U.S.C. § 1605(a)(3).

and Venezuela; and the 1954 Convention Relating to the Status of Stateless Persons—for his argument that taking his property violated international law.[3]

Mezerhane relies primarily on Article 21 of the American Convention, which provides that "[n]o one shall be deprived of his property except upon payment of just compensation," to argue that the Convention prohibits the takings of his property. Organization of American States, American Convention on Human Rights, Nov. 22, 1969, O.A.S.T.S. No. 36, 1144 U.N.T.S. 123, art. 21. Mezerhane conceded at argument, however, that the American Convention is not self-executing. In fact, although the United States signed the American Convention in 1969, the Senate never ratified it. *See Flores v. S. Peru Copper Corp.*, 414 F.3d 233, 258 (2d Cir. 2003) ("[T]he United States has declined to ratify the American Convention for more than three decades. . . .").

Mezerhane also cites Article 13 of the U.N. Convention on the Status of Refugees as support for his argument that the taking violated international law. U.N. Convention Relating to the Status of Refugees, July 28, 1951, 189 U.N.T.S. 150, art. 13. Even if Mezerhane were a refugee, the Convention governs the conduct of his host country, the United States, not of the country fled, Venezuela. Mezerhane has made no allegation of mistreatment by the United States. Finally, Mezerhane cites the Treaty of Peace, Friendship, Navigation and Commerce to

---

[3] Mezerhane cites the 1954 Convention Relating to the Status of Stateless Persons in connection with his statelessness argument, which we address in the next section.

argue that it entitles him to the same treatment in court as a U.S. citizen would receive, but this treaty requires that the two countries not violate the rights of "each other['s]" citizens; it does not address Venezuela's actions against its own citizens. Treaty of Peace, Friendship, Navigation and Commerce, U.S.-Venez., Jan. 20, 1836, 8 Stat. 466, art.13.

To date, the Eleventh Circuit has never held that the exception to sovereign immunity set out in 28 U.S.C. § 1605(a)(3) is triggered by human rights treaty-based allegations, and we decline to do so here. If successful, Mezerhane's argument would significantly extend the FSIA exception and open the courts of this country to suits involving takings abroad by foreign governments that have little or no nexus to the United States.

The Fifth Circuit previously ruled on the scope of 28 U.S.C. § 1605(a)(3) in *de Sanchez*. 770 F.2d at 1395. The court held that no violation of international law occurred where Nicaragua placed a stop-payment order on a check payable to a Nicaraguan citizen because the order affected only a foreign country's own national. *Id.* In doing so, the Fifth Circuit applied a long-standing rule that closes the doors of American courts to international-law claims based on a foreign country's domestic taking of property. *See United States v. Belmont*, 301 U.S. 324, 332 (1937) ("What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial

9

consideration here."). *De Sanchez* reaffirmed the vitality of this so-called domestic takings rule: "[w]ith a few limited exceptions, international law delineates minimum standards for the protection only of aliens; it does not purport to interfere with the relations between a nation and its own citizens." *de Sanchez*, 770 F.2d at 1395.

More recently, in *FOGADE v. ENB Revocable Trust*, our own court cited *de Sanchez* with approval in noting that "[a]s a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law." 263 F.3d 1274, 1294 (11th Cir. 2001). At their core, such claims simply are not international. *See id*; *accord Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1328 n.3 (11th Cir. 2003) (stating that "[i]nternational law prohibits expropriation of alien property without compensation, but does not prohibit governments from expropriating property from their own nationals without compensation").

Although *de Sanchez* did not address the specific treaties mentioned by Mezerhane, the Fifth Circuit did discuss how the "violation of international law" exception in the FSIA pertains to human rights law:

> The international human rights movement is premised on the belief that international law sets a minimum standard not only for the treatment of aliens but also for the treatment of human beings generally. Nevertheless, the standards of human rights that have been generally accepted—and hence incorporated into the law of nations—are still limited. They encompass only such basic rights as the right

10

not to be murdered, tortured, or otherwise subjected to cruel, inhuman or degrading punishment; the right not to be a slave; and the right not to be arbitrarily detained. At present, the taking by a state of its national's property does not contravene the international law of minimum human rights.

*Id.* at 1397 (citations omitted). Thus, *de Sanchez* adopted a limited view of the rights protected under the 28 U.S.C. § 1605(a)(3) exception to FSIA immunity and refused to apply the exception to a foreign state's taking of the property of one of its own nationals.

Mezerhane argues that in the thirty years since *de Sanchez* international human rights law has developed such that international takings now fall within the exception to sovereign immunity found in 28 U.S.C. § 1605(a)(3). As an initial matter, we note that the four treaties cited by Mezerhane predate *de Sanchez* and *FOGADE* and thus cannot qualify as new developments that undermine the domestic takings rule articulated in those cases.[4] Moreover, as we explain below, the trend in recent Supreme Court cases, if anything, tends to undercut his argument: it signals the Supreme Court's reluctance to allow international law claims based on occurrences between foreign citizens on foreign soil to proceed in U.S. courts. Allowing Mezerhane's claim to proceed would move in the contrary direction; it would broadly expand the availability of U.S. courts to resolve cases

---

[4] The American Convention was signed by the United States in 1969 and by Venezuela in 1977. Nov. 22, 1969, 1144 U.N.T.S. 123. The U.N. Convention Relating to the Status of Refugees was signed in 1951. U189 U.N.T.S. 150. The Treaty of Peace, Friendship, Navigation and Commerce between the United States and Venezuela dates back to 1836. 8 Stat. 466.

arising from events taking place exclusively on foreign soil and with a nexus to the United States that is at best marginal.

In *Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004), the Supreme Court emphasized that "[i]t is one thing for American courts to enforce constitutional limits on our own State and Federal Governments' power, but quite another to consider suits under rules that would go so far as to claim a limit on the power of foreign governments over their own citizens, and to hold that a foreign government or its agent has transgressed those limits." 542 U.S. at 727 (citing *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964)); *see also Kiobel v. Royal Dutch Petroleum Co.*, 133 S. Ct. 1659, 1664 (2013) ("Indeed, the danger of unwarranted judicial interference in the conduct of foreign policy is magnified in the context of the [Alien Tort Statute], because the question is not what Congress has done but instead what courts may do.").

In any event, under the domestic takings rule, Mezerhane's allegations of takings do not constitute a "violation of international law" for purposes of the FSIA exception in 28 U.S.C. § 1605(a)(3) and thus Venezuela, SUDEBAN, and FOGADE are entitled to sovereign immunity from suit under the FSIA.

## III.    Statelessness

In an attempt to avoid the domestic takings rule, Mezerhane argues that he has effectively been stripped of his citizenship and that he is *de facto* stateless. He

12

cites to the 1954 Convention Relating to the Status of Stateless Persons and relies on cases arising from Nazi Germany's treatment of Holocaust victims to argue that Venezuela's actions are international in character and thus subject to international law.

Even if we were to accept that Mezerhane was *de facto* stateless, the FSIA exception to sovereign immunity found in § 1605(a)(3) does not apply to his claims because his claims do not implicate multiple states—they relate entirely to Venezuela. We note with approval the Fifth Circuit's statement in *de Sanchez* that "[i]njuries to individuals have been cognizable only where they implicate two or more different nations: if one state injures the national of another state, then this can give rise to a violation of international law since the individual's injury is viewed as an injury to his state." 770 F.2d. at 1396.

Attempting to sidestep the single-nation problem in this case, Mezerhane cites cases in the aftermath of Nazi Germany to argue that courts have allowed suits to proceed under § 1605(a)(3) where Jewish Holocaust victims brought claims against their countries. These cases are distinguishable, however, because they all involved the taking of property in the context of genocide. For example, in the Holocaust claim case of *Abelesz v. Magyar Nemzeti Bank*, the Seventh Circuit acknowledged that "[the rule] that a so-called 'domestic taking' cannot violate international law, has been recognized and applied in many decisions in U.S.

13

courts" and noted that "[i]f we were dealing with claims of *only* expropriation of property, as was true in almost all of the cited cases, we would agree and would apply the domestic takings [rule] here." 692 F.3d 661, 674 (7th Cir. 2012). That court, however, concluded that, because plaintiffs alleged that the expropriation of property was "an integral part of the genocidal plan to depopulate Hungary of its Jews," *id.* at 675, the taking violated international norms against genocide, and thus violated international law, *id.* at 676. Similarly, in *de Csepel v. Republic of Hungary*, the D.C. district court noted the "extraordinary facts" of the case as it described the conditions to which Jews were subjected in Hungary, including "forced labor inside and outside Hungary, and ultimately genocide." 808 F. Supp. 2d 113, 129-30 (D.D.C. 2011), *rev'd in part on other grounds*, 714 F.3d 591 (D.C. Cir. 2013).

Mezerhane points to no "extraordinary facts" that make his case comparable to those of Holocaust victims. The cases on which Mezerhane relies arose in the unique context of a mass genocide perpetrated by Nazi Germany. They do not apply to Mezerhane's claims, which involve no such allegations, and therefore do not provide a ground to exempt Mezerhane's case from the domestic takings rule.

## IV.    The Act of State Doctrine

Even if defendants were not entitled to sovereign immunity under the FSIA, the act of state doctrine also bars Mezerhane's suit. The act of state doctrine, "is a

14

judicially-created rule of decision that 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *Glen*, 450 F.3d at 1253 (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).  Adopted for reasons of comity, it forbids U.S. courts from adjudicating the acts of a foreign sovereign in its own territory. *See Underhill v. Hernandez*, 168 U.S. 250, 252 (1897). "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, done within its own territory." *Id.*

Mezerhane argues that the Second Hickenlooper Amendment exempts his takings case from the act of state doctrine. Enacted to overrule, in part, the *Sabbatino* decision,  *Fogade*, 263 F.3d at 1293, the Amendment states in relevant part that:

> no court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state *in violation of the principles of international law . . . .*

22 U.S.C. § 2370(e)(2) (emphasis added). Interpreting the Second Hickenlooper Amendment in *FOGADE*, we held that the Amendment overruled *Sabbatino* only to the extent that the latter held that the act of state doctrine would apply even when a foreign state had violated international law. 263 F.3d at 1293. Yet, as noted

15

*supra*, FOGADE concluded that a foreign nation's confiscation of the property of one of its own nationals does not, as a rule, constitute a violation of international law, *id*. at 1294, and therefore "the Second Hickenlooper Amendment does not preclude application of the act of state doctrine." 263 F.3d at 1295. The same is true here.

Mezerhane argues that the confiscation of his property violated international treaties and therefore "violat[ed . . .] principles of international law" for purposes of the Second Hickenlooper Amendment. 22 U.S.C. § 2370(e)(2). However, to apply the act of state doctrine consistently with the FSIA—a reading supported by the similarity of the language in 28 U.S.C. § 1605(a)(3) and 28 U.S.C. § 2370—a "violation of the principles of international law" must be interpreted in the same way in both provisions. In Part II of this opinion, we concluded that a violation of a treaty is not a violation of international law for FSIA purposes and we reach the same conclusion for the act of state doctrine.

In conclusion, notwithstanding the Second Hickenlooper Amendment, because in this case a foreign plaintiff is protesting a taking by a foreign sovereign that took place outside of the United States, the act of state doctrine bars a U.S. court from questioning the sovereign's act. Therefore, both that doctrine and the inapplicability of the statutory exception to sovereign immunity found in 28 U.S.C.

16

§ 1605(a)(3) preclude our review of plaintiff's claim that the government of Venezuela wrongfully expropriated his property.

## CONCLUSION

For the reasons stated above, we affirm the district court's dismissal of Mezerhane's complaint.

**AFFIRMED.**