(Slip Opinion)  OCTOBER TERM, 2016  1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## BOLIVARIAN REPUBLIC OF VENEZUELA ET AL. *v.* HELMERICH & PAYNE INTERNATIONAL DRILLING CO. ET AL.

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

No. 15–423.   Argued November 2, 2016—Decided May 1, 2017

The Foreign Sovereign Immunities Act (FSIA) shields foreign states from suits in United States Courts, 28 U. S. C. §1604, with specified exceptions. The expropriation exception applies to "any case . . . in which rights in property taken in violation of international law are in issue and that property . . . is owned or operated by an agency or instrumentality of the foreign state . . . engaged in a commercial activity in the United States." §1605(a)(3).

A wholly owned Venezuelan subsidiary (Subsidiary) of an American company (Parent) has long supplied oil rigs to oil development entities that were part of the Venezuelan Government. The American Parent and its Venezuelan Subsidiary (plaintiffs) filed suit in federal court against those entities (Venezuela), claiming that Venezuela had unlawfully expropriated the Subsidiary's rigs by nationalizing them. Venezuela moved to dismiss the case on the ground that its sovereign immunity deprived the District Court of jurisdiction. Plaintiffs argued that the case falls within the expropriation exception, but Venezuela claimed that international law did not cover the expropriation of property belonging to a country's nationals like the Subsidiary and that the American Parent did not have property rights in the Subsidiary's assets. The District Court agreed as to the Subsidiary, dismissing its claim on jurisdictional grounds. But it rejected the claim that the Parent had no rights in the Subsidiary's property. The District of Columbia Circuit reversed in part and affirmed in part, finding that both claims fell within the exception. With respect to the Subsidiary's claim, it concluded that a sovereign's taking of its own nationals' property would violate international law

2     BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Syllabus

if the expropriation unreasonably discriminated based on a compa-
ny's shareholders' nationality.  With respect to the Parent's claim, it
held that the exception applied because the Parent had raised its
rights in a nonfrivolous way.  The court decided only whether the
plaintiffs might have a nonfrivolous expropriation claim, making
clear that, under its standard, a nonfrivolous argument would be suf-
ficient to bring a case within the scope of the exception.  Given the
factual stipulations, the court concluded, the Subsidiary had satisfied
that standard for purposes of surviving a motion to dismiss.

*Held*: The nonfrivolous-argument standard is not consistent with the
FSIA.  A case falls within the scope of the expropriation exception on-
ly if the property in which the party claims to hold rights was indeed
"property taken in violation of international law."  A court should de-
cide the foreign sovereign's immunity defense "[a]t the threshold" of
the action, *Verlinden B. V.* v. *Central Bank of Nigeria*, 461 U. S. 480,
493, resolving any factual disputes as near to the outset of the case as
is reasonably possible.  Pp. 6–16.

   (a) The expropriation exception grants jurisdiction only where
there is a legally valid claim that a certain kind of right is at issue
(*property* rights) and that the relevant property was taken in a cer-
tain way (in violation of international law).  Simply making a non-
frivolous argument to that effect is not sufficient.  This reading is
supported by the provision's language, which applies in a "case. . . in
which rights in property taken in violation of international law are in
issue."  Such language would normally foresee a judicial decision
about the jurisdictional matter.  This interpretation is supported by
precedent.  See, *e.g., Permanent Mission of India to United Nations* v.
*City of New York*, 551 U. S. 193, 201–202.  It is also supported by a
basic objective of the FSIA, which is to follow international law prin-
ciples, namely, that granting foreign sovereigns immunity from suit
both recognizes the "absolute independence of every sovereign au-
thority" and helps to "induc[e]" each nation state, as a matter of "in-
ternational comity," to "respect the independence and dignity of every
other," *Berizzi Brothers Co.* v. *S. S. Pesaro*, 271 U. S. 562, 575.  Noth-
ing in the FSIA's history suggests that Congress intended a radical
departure from these principles in codifying the mid-20th-century
doctrine of "restrictive" sovereign immunity, which denies immunity
in cases "arising out of a foreign state's strictly commercial acts," but
applies immunity in "suits involving the foreign sovereign's public
acts," *Verlinden*, *supra,* at 487.  It is thus not surprising that the ex-
propriation exception on its face emphasizes conformity with interna-
tional law, requiring both a commercial connection with the United
States and a taking of property "in violation of international law."

   A "nonfrivolous-argument" reading of the exception would under-

mine the objectives embedded in the statute's language, history, and structure. It could also embroil a foreign sovereign in an American lawsuit for some time by adopting a standard limited only by the bounds of a lawyer's (nonfrivolous) imagination. And it could cause friction with other nations, leading to reciprocal actions against this country. Pp. 6–12.

   (b) Plaintiffs' arguments to the contrary are unpersuasive. They suggest that the expropriation exception should be treated similarly to 28 U. S. C. §1331's "arising under" jurisdiction, which applies if a plaintiff can make a nonfrivolous argument that a federal law provides the relief sought—even if, in fact, it does not, *Bell* v. *Hood*, 327 U. S. 678 685. But §1331 differs from the exception in language and concerns. Section 1331 often simply determines which court doors— federal or state—are open, and neither it nor related jurisdictional sections seek to provide a sovereign foreign nation with immunity— the FSIA's basic objective. Nor does the text of §1331 suggest that consistency with international law is of particular importance.

   Plaintiffs also claim that the nonfrivolous-argument approach will work little harm since the matter could be resolved by motion practice before the sovereign bears the expense of a full trial. But resolving a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) or summary judgment under Rule 56 may impose increased burdens of time and expense upon the foreign nation. And a district court's decision that there is a "violation of international law" as a matter of jurisdiction may be immediately appealable as a collateral order, while the same decision made pursuant to a Rule 12(b)(6) or Rule 56 motion would be a decision on the "merits" not subject to immediate appeal. Moreover, the Circuit would part with its nonfrivolous-argument standard where a "violation of international law" is not an element of the claim to be decided on the merits. This bifurcated approach is difficult to reconcile with the statute's language, history, or purpose; and it creates needless complexity for judges and lawyers, domestic and foreign. Pp. 12–16.

784 F. 3d 804, vacated and remanded.

   BREYER, J., delivered the opinion of the Court, in which all other Members joined, except GORSUCH, J., who took no part in the consideration or decision of the case.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 15–423

BOLIVARIAN REPUBLIC OF VENEZUELA, ET AL., PETITIONERS *v.* HELMERICH & PAYNE INTERNATIONAL DRILLING CO., ET AL.

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

[May 1, 2017]

JUSTICE BREYER delivered the opinion of the Court.

The Foreign Sovereign Immunities Act of 1976 (FSIA or Act), provides, with specified exceptions, that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States . . . ." 28 U. S. C. §1604. One of the jurisdictional exceptions—the expropriation exception—says that

"[a] foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . (3) in which rights in property taken in violation of international law are in issue and that property . . . is owned or operated by an agency or instrumentality of the foreign state . . . engaged in a commercial activity in the United States." §1605(a)(3).

The question here concerns the phrase "case . . . in which rights in property taken in violation of international law are in issue."

Does this phrase mean that, to defeat sovereign immunity, a party need only make a "nonfrivolous" argument

2    BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

that the case falls within the scope of the exception?  Once
made, does the existence of that nonfrivolous argument
mean that the court retains jurisdiction over the case until
the court decides, say, the merits of the case?  Or does a
more rigorous jurisdictional standard apply?  To put the
question more generally: What happens in a case where
the party seeking to rely on the expropriation exception
makes a nonfrivolous, but ultimately incorrect, claim that
his property was taken in violation of international law?

In our view, a party's nonfrivolous, but ultimately incor-
rect, argument that property was taken in violation of
international law is insufficient to confer jurisdiction.
Rather, state and federal courts can maintain jurisdiction
to hear the merits of a case only if they find that the prop-
erty in which the party claims to hold rights was indeed
"property taken in violation of international law."  Put
differently, the relevant factual allegations must make out
a legally valid claim that a certain kind of right is at issue
(*property* rights) and that the relevant property was taken
in a certain way (in violation of international law).  A good
argument to that effect is not sufficient.  But a court nor-
mally need not resolve, as a jurisdictional matter, disputes
about whether a party actually held rights in that prop-
erty; those questions remain for the merits phase of the
litigation.

Moreover, where jurisdictional questions turn upon
further factual development, the trial judge may take
evidence and resolve relevant factual disputes.  But, con-
sistent with foreign sovereign immunity's basic objective,
namely, to free a foreign sovereign from *suit*, the court
should normally resolve those factual disputes and reach a
decision about immunity as near to the outset of the case
as is reasonably possible.  See *Verlinden B. V.* v. *Central
Bank of Nigeria,* 461 U. S. 480, 493–494 (1983).

I

Since the mid-1970's a wholly owned Venezuela-incorporated subsidiary (Subsidiary) of an American company (Parent) supplied oil rigs to oil development entities that were part of the Venezuelan Government. In 2011 the American Parent company and its Venezuelan Subsidiary (the respondents here) brought this lawsuit in federal court against those foreign government entities. (The entities go by their initials, PDVSA, but we shall normally refer to them as "Venezuela" or the "Venezuelan Government.") The American Parent and the Venezuelan Subsidiary claimed that the Venezuelan Government had unlawfully expropriated the Subsidiary's oil rigs. And they sought compensation.

According to stipulated facts, by early 2010 the Venezuelan Government had failed to pay more than $10 million that it owed the Subsidiary. At that point the government sent troops to the equipment yard where the rigs were stored, prevented the Subsidiary from removing the rigs, and issued a "'Decree of Expropriation'" nationalizing the rigs. App. 72–74. Subsequently, the president of the oil development entities led a rally at the Subsidiary's offices, where he referred to the Venezuelan Subsidiary as an "'American company'" with "'foreign gentlemen investors.'" *Id.,* at 54.

Venezuela asked the court to dismiss the case on the ground that Venezuela possessed sovereign immunity and that the court consequently lacked "jurisdiction" to hear the case. See 28 U. S. C. §1604; Fed. Rules Civ. Proc. 12(b)(1) and (b)(2); *Verlinden, supra,* at 485, n. 5 (explaining that a court lacks "subject-matter" and "personal" jurisdiction over a foreign sovereign unless an FSIA exception applies). The companies replied that the case falls within the expropriation exception. Venezuela in turn argued that the Subsidiary's expropriation claim did not satisfy the exception because "'international law does not

4   BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

cover expropriations of property belonging to a country's own nationals'"; the taking was not "'in violation of international law,'" and the exception thus does not apply. Record in No. 11–cv–01735 (D DC), Doc. 22, p. 13. Venezuela further argued that the American Parent's nationality makes no difference because, "as a corporate parent, [it] does not own [the Subsidiary's] assets." *Id.,* Doc. 24, at 12.

The parties agreed that the District Court should then decide whether the exception applies, and it should do so on the basis of governing law, taking all of the plaintiffs' well-pleaded allegations as true and construing the complaint in the light most favorable to the plaintiffs. App. 119. The court decided, in relevant part, that the exception did not apply to the Venezuelan Subsidiary's claim because the Subsidiary was a national of Venezuela. See 971 F. Supp. 2d 49, 57–61 (2013). The court concluded that Venezuela consequently possessed sovereign immunity, and it dismissed the Subsidiary's claim on jurisdictional grounds. It rejected, however, Venezuela's argument that the Parent had no rights in property in the Subsidiary. It concluded that Venezuela's "actions have deprived [the Parent], individually, of its essential and unique rights as sole shareholder . . . by dismantling its voting power, destroying its ownership, and frustrating its control over the company." *Id.,* at 73.

The Venezuelan Subsidiary appealed the dismissal of its expropriation claim, and Venezuela appealed the court's refusal to dismiss the Parent's claim. The Court of Appeals for the District of Columbia Circuit reversed in part and affirmed in part the District Court's conclusions. It decided that *both* the Subsidiary's and the Parent's claims fell within the exception.

With respect to the Subsidiary's claim, the court agreed that a sovereign's taking of its own nationals' property *normally* does not violate international law. But, the

court said, there is an "exception" to this rule. And that exception applies when a sovereign's expropriation unreasonably discriminates on the basis of a company's shareholders' nationality, 784 F. 3d 804, 812 (CADC 2015) (citing *Banco Nacional de Cuba* v. *Sabbatino*, 307 F. 2d 845 (CA2 1962)). That exception, it added, might apply here, in which case the expropriation would violate international law, the FSIA's expropriation exception would apply, and the federal courts would possess jurisdiction over the case. 784 F. 3d, at 813. With respect to the Parent's expropriation claim, the court agreed with the District Court that the expropriation exception applied because the Parent had "'put its rights in property in issue in a non-frivolous way.'" *Id.,* at 816.

For present purposes, it is important to keep in mind that the Court of Appeals did not decide (on the basis of the stipulated facts) that the plaintiffs' allegations *are* sufficient to show their property was taken in violation of international law. It decided instead that the plaintiffs *might* have such a claim. And it made clear the legal standard that it would apply. It said that, in deciding whether the expropriation exception applies, it would set an "exceptionally low bar." *Id.,* at 812. Any possible, *i.e.,* "'non-frivolous,'" *ibid.,* claim of expropriation is sufficient, in the Court of Appeals' view, to bring a case within the scope of the FSIA's exception. In particular: If a plaintiff alleges facts and claims that permit the plaintiff to make an expropriation claim that is *not* "'*wholly insubstantial or frivolous,*'" then the exception permits the suit and the sovereign loses its immunity. *Ibid.* (emphasis added). Given the factual stipulations, the Court of Appeals did not suggest further factfinding on this jurisdictional issue but, rather, decided that the Subsidiary had "satisfied this Circuit's forgiving standard for surviving a motion to dismiss in an FSIA case." *Id.*, at 813.

Venezuela filed a petition for certiorari asking us to

decide whether the Court of Appeals had applied the
correct standard in deciding that the companies had met
the expropriation exception's requirements. We agreed to
do so.

## II

Foreign sovereign immunity is jurisdictional in this case
because explicit statutory language makes it so.    See
§1604 ("[A] foreign state shall be immune from the juris-
diction of the courts of the United States and of the States
except as provided" by the FSIA's exceptions); §1605(a) ("A
foreign state shall not be immune from the jurisdiction" of
federal and state courts if the exception at issue here is
satisfied).    Given the parties' stipulations as to all rele-
vant facts, our inquiry poses a "'pure question of statutory
construction,'" *Republic of Austria* v. *Altmann*, 541 U. S.
677, 701 (2004). In our view, the expropriation exception
grants jurisdiction only where there is a valid claim that
"property" has been "taken in violation of international
law." §1605(a)(3). A nonfrivolous argument to that effect
is insufficient.

For one thing, the provision's language, while ambigu-
ous, supports such a reading. It says that there is juris-
diction in a "case . . . in which rights in property taken in
violation of international law are in issue." *Ibid.* Such
language would normally foresee a judicial decision about
the jurisdictional matter. And that matter is whether a
certain kind of "right" is "at issue," namely, a *property*
right *taken in violation of international law.* To take a
purely hypothetical example, a party might assert a claim
to a house in a foreign country. If the foreign country
nationalized the house and, when sued, asserted sovereign
immunity, then the claiming party would as a jurisdic-
tional matter prove that he claimed "property" (which a
house obviously is) and also that the property was "taken
in violation of international law." He need not show as a

*jurisdictional* matter that he, rather than someone else, owned the house. That question is part of the merits of the case and remains "at issue."

We recognize that merits and jurisdiction will sometimes come intertwined. Suppose that the party asserted a claim to architectural plans for the house. It might be necessary to decide whether the law recognizes the kind of right that he asserts, or whether it is a right in "property" that was "taken in violation of international law." Perhaps that is the only serious issue in the case. If so, the court must still answer the jurisdictional question. If to do so, it must inevitably decide some, or all, of the merits issues, so be it.

Our reading of the statute is consistent with its language. The case is one which the existence of "rights" remains "at issue" until the court decides the merits of the case. But whether the rights asserted are rights of a certain kind, namely, rights in "property taken in violation of international law," is a jurisdictional matter that the court must typically decide at the outset of the case, or as close to the outset as is reasonably possible.

Precedent offers a degree of support for our interpretation. In *Permanent Mission of India to United Nations* v. *City of New York*, 551 U. S. 193 (2007), we interpreted a different FSIA exception for cases "in which . . . rights in immovable property situated in the United States are in issue." §1605(a)(4). We held that there was jurisdiction over the case because the plaintiff's lawsuit to enforce a tax lien "directly implicate[d]" the property rights described by the FSIA exception. See *id.*, at 200–201. We did not simply rely upon a finding that the plaintiff had made a nonfrivolous argument that the exception applied.

For another thing, one of the FSIA's basic objectives, as shown by its history, supports this reading. The Act for the most part embodies basic principles of international law long followed both in the United States and elsewhere.

8   BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

See *Schooner Exchange* v. *McFaddon,* 7 Cranch 116, 136–
137 (1812); see also *Verlinden*, 461 U. S., at 493 (explain-
ing that the Act "comprehensively regulat[es] the amen-
ability of foreign nations to suit in the United States").  Our
courts have understood, as international law itself under-
stands, foreign nation states to be "independent sovereign"
entities.  To grant those sovereign entities an immunity
from suit in our courts both recognizes the "absolute inde-
pendence of every sovereign authority" and helps to "'in-
duc[e]'" each nation state, as a matter of "'international
comity,'" to "'respect the independence and dignity of
every other,'" including our own.  *Berizzi Brothers Co.* v.
*S. S. Pesaro*, 271 U. S. 562, 575 (1926) (quoting *The Par-
lement Belge*, [1880] 5 P. D. 197, 214–215 (appeal taken
from Admiralty Div.)).

   In the mid-20th century, we, like many other nations,
began to treat nations acting in a commercial capacity like
other commercial entities.  See *Permanent Mission*, *supra,*
at 199–200.  And we consequently began to limit our
recognition of sovereign immunity, denying that immunity
in cases "arising out of a foreign state's strictly commercial
acts," but continuing to apply that doctrine in "suits in-
volving the foreign sovereign's *public acts*," *Verlinden*, 461
U. S., at 487 (emphasis added).

   At first, our courts, aware of the expertise of the Execu-
tive Branch in matters of foreign affairs, relied heavily
upon the advice of that branch when deciding just when
and how this "restrictive" sovereign immunity doctrine
applied.  *Ibid.*  See also H. R. Rep. No. 94–1487, pp. 8–9
(1976) (similar).  But in 1976, Congress, at the urging of
the Department of State and Department of Justice, began
to codify the doctrine.  The resulting statute, the FSIA,
"starts from a premise of immunity and then creates
exceptions to the general principle."  *Id.,* at 17; *Verlinden*,
*supra*, at 493.  Almost all the exceptions involve commerce
or immovable property located in the United States.  *E.g.,*

§§1605(a)(2) and (4); see also §1602 (expressing the finding that "[u]nder international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned"). The statute thereby creates a doctrine that by and large continues to reflect basic principles of international law, in particular those principles embodied in what jurists refer to as the "restrictive" theory of sovereign immunity. See, *e.g.,* Restatement (Third) of Foreign Relations Law of the United States §451, and Comment *a* (1986) (describing the restrictive theory of immunity); United Nations General Assembly, Convention on Jurisdictional Immunities of States and Their Property, Res. 59/38, Arts. 5, 10–12 (Dec. 2, 2004) (adopting a restrictive theory of immunity and withdrawing immunity for loss of property where, among other requirements, "the act or omission occurred in whole or in part in the territory of th[e] other State"); United Nations General Assembly, Report of the Ad Hoc Committee on Jurisdictional Immunities of States and Their Property, Supp. A/59/22 No. 1, pp. 7–11 (Mar. 1–5, 2004) (same).

We have found nothing in the history of the statute that suggests Congress intended a radical departure from these basic principles. To the contrary, the State Department, which helped to draft the FSIA's language (and to whose views on sovereign immunity this Court, like Congress, has paid special attention, *Altmann*, 541 U. S., at 696), told Congress that the Act was "drafted keeping in mind what we believe to be the general state of the law internationally, so that we conform fairly closely . . . to our accepted international standards," Hearing on H. R. 3493 before the Subcommittee on Claims and Governmental Relations of the House of Representatives Committee on the Judiciary, 93d Cong., 1st Sess., 18 (1973). The Department added that, by doing so, we would diminish the likelihood that other nations would each go their own way, thereby "subject[ing]" the United States "abroad" to more

10  BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

claims "than we permit in this country . . . ." *Ibid.* It is consequently not surprising to find that the expropriation exception on its face emphasizes conformity with international law by requiring not only a commercial connection with the United States but also a taking of property "*in violation of international law.*"

We emphasize this point, embedded in the statute's language, history, and structure, because doing so reveals a basic objective of our sovereign immunity doctrine, which a "nonfrivolous-argument" reading of the expropriation exception would undermine. A sovereign's taking or regulating of its own nationals' property within its own territory is often just the kind of foreign sovereign's public act (a "*jure imperii*") that the restrictive theory of sovereign immunity ordinarily leaves immune from suit. See *Permanent Mission*, 551 U. S., at 199 (describing the FSIA's distinction between public acts, or *jure imperii*, and purely commercial ones); Restatement (Third) of Foreign Relations Law of the United States §712, at 196 (noting that, under international law, a state is responsible for a "taking of the property of a *national of another state*" (emphasis added)). See also Restatement (Fourth) of Foreign Relations Law of the United States §455, Reporter's Note 12, p. 9 (Tent. Draft No. 2, Mar. 22, 2016) (noting that "[n]o provision comparable" to the exception "has yet been adopted in the domestic immunity statutes of other countries" and that expropriations are considered acts *jure imperii*); *United States* v. *Belmont*, 301 U. S. 324, 332 (1937); B. Cheng & G. Schwarzberger, General Principles of Law as Applied by International Courts and Tribunals 37–38 (1953) (collecting cases describing "the power of the sovereign State to expropriate" (internal quotation marks omitted)); *Jurisdictional Immunities of the State* (*Germany* v. *Italy*), 2012 I. C. J. 99, 123–125, ¶¶56–60 (Judgt. of Feb. 3) (noting consistent state practice in respect to the distinction between public and commercial acts and describ-

ing an international law of immunity recognizing such a difference); *Altmann*, *supra*, at 708 (BREYER, J., concurring) (describing the French Court of Appeals' decision about whether a King who has abdicated the throne is "'entitled to claim . . . immunity'" as "'Hea[d] of State'" when his sovereign status at the time of suit was in doubt (quoting *Ex-King Farouk of Egypt* v. *Christian Dior*, 84 Clunet 717, 24 I. L. R. 228, 229 (CA Paris 1957))).

To be sure, there are fair arguments to be made that a sovereign's taking of its own nationals' property sometimes amounts to an expropriation that violates international law, and the expropriation exception provides that the general principle of immunity for these otherwise public acts should give way. But such arguments are about whether such an expropriation does violate international law. To find jurisdiction only where a taking *does violate* international law is thus consistent with basic international law and the related statutory objectives and principles that we have mentioned. But to find jurisdiction where a taking does *not* violate international law (*e.g.,* where there is a nonfrivolous but ultimately *incorrect* argument that the taking violates international law) is inconsistent with those objectives. And it is difficult to understand why Congress would have wanted that result.

Moreover, the "nonfrivolous-argument" interpretation would, in many cases, embroil the foreign sovereign in an American lawsuit for an increased period of time. It would substitute for a more workable standard ("violation of international law") a standard limited only by the bounds of a lawyer's (nonfrivolous) imagination. It would create increased complexity in respect to a jurisdictional matter where clarity is particularly important. *Hertz Corp.* v. *Friend*, 559 U. S. 77, 94–95 (2010). And clarity is doubly important here where foreign nations and foreign lawyers must understand our law.

Finally, the Solicitor General and the Department of

12  BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

State also warn us that the nonfrivolous-argument inter-
pretation would "affron[t]" other nations, producing fric-
tion in our relations with those nations and leading some
to reciprocate by granting their courts permission to em-
broil the United States in "expensive and difficult litiga-
tion, based on legally insufficient assertions that sovereign
immunity should be vitiated."  Brief for United States as
*Amicus Curiae* 21–22.  (At any given time the Department
of Justice's Office of Foreign Litigation represents the
United States in about 1,000 cases in 100 courts around
the world.  *Ibid.*)  See also *National City Bank of N. Y.* v.
*Republic of China*, 348 U. S. 356, 362 (1955) (noting that
our grant of immunity to foreign sovereigns dovetails with
our own interest in receiving similar treatment).

## III

The plaintiffs make two important arguments to the
contrary.  First, they point to the federal statute that gives
federal courts jurisdiction over cases "arising under the
Constitution, laws, or treaties of the United States," 28
U. S. C. §1331.  They note that in *Bell* v. *Hood*, 327 U. S.
678 (1946), this Court held that the "arising under" stat-
ute confers jurisdiction if a plaintiff can make a nonfrivo-
lous argument that a federal law provides the relief he
seeks—even if, in fact, it does not.  See *id.*, at 685 (juris-
diction exists where, if the "Constitution and laws of the
United States are given one construction," a claim will be
"sustained," but if the laws are given a different construc-
tion, the claim "will be defeated").  And the plaintiffs say
we should treat the expropriation exception similarly.

Section 1331, however, uses different language from the
expropriation exception ("arising under") and focuses on
different concerns.  Section 1331 often simply determines
which court's doors are open (federal or state).  Cf. *Mims* v.
*Arrow Financial Services, LLC*, 565 U. S. 368, 375–379
(2012).  Unlike the FSIA, neither that jurisdictional sec-

tion nor related jurisdictional sections seeks to provide a sovereign foreign nation (or any party) with immunity—the basic FSIA objective. See *Dole Food Co.* v. *Patrickson*, 538 U. S. 468, 479 (2003) (FSIA's objective is to give "protection from the inconvenience of suit as a gesture of comity"); *Republic of Philippines* v. *Pimentel*, 553 U. S. 851, 866 (2008). And unlike the expropriation exception, the "arising under" statute's language does not suggest that consistency with international law is of particular importance.

Moreover, this Court has interpreted other jurisdictional statutes differently. Where jurisdiction depends on diversity of citizenship, for example, courts will look to see whether the parties are in fact diverse, not simply whether they are arguably so. See *Indianapolis* v. *Chase Nat. Bank*, 314 U. S. 63, 69 (1941); *McNutt* v. *General Motors Acceptance Corp.*, 298 U. S. 178, 189 (1936); see also 13E C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure §3611 (2009). We do not believe either jurisdictional analogy (28 U. S. C. §1331 or §1332) is particularly helpful, but the expropriation exception's substantive goals suggest that the diversity jurisdiction example provides a marginally closer analogy.

Second, the plaintiffs argue that the nonfrivolous-argument approach will work little harm. They say that a court faced with an arguable, but ultimately incorrect, claim of jurisdiction can simply decide the same question—say, whether there was a "violation of international law"—as part of its decision on the merits. Thus a foreign sovereign defendant (in court because a plaintiff has made a nonfrivolous but incorrect argument that its property was taken in violation of international law) can simply move for judgment on the merits under Rule 12(b)(6), which provides for judgment where a plaintiff does not "state a claim upon which relief can be granted." Or the defendant could move for summary judgment under Rule

14  BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

56.  In a word, the defendant may not need to undergo a
full trial and judgment, remaining in court until the bitter
end.

These alternatives, however, have their own problems.
For one thing, they will sometimes mean increased delay,
imposing increased burdens of time and expense upon the
foreign nation.  For another, where a district court decides
that there is a "violation of international law" as a matter
of *jurisdiction*, then (according to the Courts of Appeals)
the losing sovereign nation can immediately appeal the
decision as a collateral order.  But the same decision made
to dispose of, say, a Rule 12(b)(6) motion or a Rule 56
motion would not be a "collateral order."  It would be a
decision on the "merits."  And the foreign sovereign would
not enjoy a right to take an immediate appeal.  See *Coopers & Lybrand* v. *Livesay*, 437 U. S. 463, 468 (1978) (permitting interlocutory appeal of a collateral order that
"resolve[s] an important issue completely separate from
the merits of the action"); *Will* v. *Hallock*, 546 U. S. 345,
349 (2006) (same).  See also *Intel Corp.* v. *Commonwealth
Scientific*, 455 F. 3d 1364, 1366 (CA Fed. 2006) (permitting
collateral appeal of an FSIA jurisdictional decision denying immunity); *Rubin* v. *Islamic Republic of Iran*, 637
F. 3d 783, 785 (CA7 2011) (same); *Compania Mexicana de
Aviacion* v. *Central Dist. of Cal.*, 859 F. 2d 1354, 1356
(CA9 1988) (*per curiam*) (same); *Foremost-McKesson* v.
*Islamic Republic of Iran*, 905 F. 2d 438, 443 (CADC 1990)
(same).

Moreover, what is a court to do in a case where a "violation of international law," while a jurisdictional prerequisite, is *not* an element of the claim to be decided on the
merits?  The Circuit has suggested that they arise when
the plaintiffs' claim is not an "expropriation claim," but
rather a simple common-law claim of conversion, restitution, or breach of contract, the merits of which do not
involve the merits of international law.  See *Simon* v.

*Republic of Hungary*, 812 F. 3d 127, 141–142 (2016). The Circuit has recognized that there are such cases, *id.,* at 141, and a cursory survey of the principal district courts in which these cases are brought confirms the reality of the problem. See, *e.g., Philipp* v. *Federal Republic of Germany*, \_\_\_ F. Supp. 3d \_\_\_, 2017 WL 1207408 (DC, Mar. 31, 2017) (deciding whether the expropriation exception is satisfied where the complaint pleads only common-law or statutory claims for relief); *De Csepel* v. *Hungary*, 169 F. Supp. 3d 143 (DC 2016) (similar); *Pablo Star Ltd.* v. *Welsh Government*, 170 F. Supp. 3d 597 (SDNY 2016) (similar); *Chettri* v. *Nepal*, 2014 WL 4354668 (SDNY, Sept. 2, 2014) (similar); Order Granting Defendants' Motion To Dismiss in *Lu* v. *Central Bank of Republic of China*, No. 2:12–cv–317 (CD Cal., June 13, 2013) (similar); *Orkin* v. *Swiss Confederation*, 770 F. Supp. 2d 612 (SDNY 2011) (similar); *Hammerstein* v. *Federal Republic of Germany*, 2011 WL 9975796 (EDNY, Aug. 1, 2011) (similar); *Cassirer* v. *Kingdom of Spain*, 461 F. Supp. 2d 1157 (CD Cal. 2006) (similar). Indeed, cases in which the jurisdictional inquiry does not overlap with the elements of a plaintiff's claims have been the norm in cases arising under other exceptions to the FSIA. *E.g., Republic of Argentina* v. *Weltover, Inc.*, 504 U. S. 607, 610 (1992) (deciding whether a plaintiffs' breach-of-contract claim satisfied the jurisdictional requirements of the commercial-activity exception, §1605(a)(2)).

To address the problem raised by these cases in which the "jurisdictional and merits inquiries" are not fully "overlap[ping]," the Circuit has held that a district court is not to apply its nonfrivolous-argument standard in such cases. *Simon*, 812 F. 3d, at 141. Rather, a court is to ask "whether the plaintiffs' allegations satisfy the jurisdictional standard." *Ibid.*

We can understand why the Circuit has departed from its nonfrivolous-argument standard in these latter cases.

16  BOLIVARIAN REPUBLIC OF VENEZUELA *v.* HELMERICH &
PAYNE INT'L DRILLING CO.

Opinion of the Court

For, unless it did so, how could a foreign nation ever obtain a decision on the merits of the nonfrivolous argument that a plaintiff has advanced?  But what in the statutory provision suggests that sometimes courts should, but sometimes they should not, simply look to the existence of a nonfrivolous argument when they decide whether the requirements of the expropriation exception are satisfied? It is difficult, if not impossible, to reconcile this bifurcated approach with the statute's language.  It receives little, if any, support from the statute's history or purpose.  And, it creates added complexity, making it more difficult for judges and lawyers, domestic and foreign, to understand the intricacies of the law.

## IV

We conclude that the nonfrivolous-argument standard is not consistent with the statute. Where, as here, the facts are not in dispute, those facts bring the case within the scope of the expropriation exception only if they do show (and not just arguably show) a taking of property in violation of international law.  Simply making a nonfrivolous argument to that effect is not sufficient.  Moreover, as we have previously stated, a court should decide the foreign sovereign's immunity defense "[a]t the threshold" of the action.  *Verlinden*, 461 U. S., at 493.  As we have said, given the parties' stipulations as to all relevant facts, the question before us is purely a legal one and can be resolved at the outset of the case.  If a decision about the matter requires resolution of factual disputes, the court will have to resolve those disputes, but it should do so as near to the outset of the case as is reasonably possible.

\*     \*     \*

The judgment of the Court of Appeals is vacated, and the case is remanded for further proceedings consistent with this opinion.

Opinion of the Court

*It is so ordered.*

JUSTICE GORSUCH took no part in the consideration or decision of this case.