Justice ALITO delivered the opinion of the Court.
This case concerns the requirements applicable to a particular method of serving civil process on a foreign state. Under the Foreign Sovereign Immunities Act of 1976 (FSIA), a foreign state may be served by means of a mailing that is "addressed and dispatched ... to the head of the ministry of foreign affairs of the foreign state concerned." 28 U.S.C. § 1608(a)(3). The question now before us is whether this provision is satisfied when a service packet that names the foreign minister is mailed to the foreign state's embassy in the United States. We hold that it is not. Most naturally read, § 1608(a)(3) requires that a mailing be sent directly to the foreign minister's office in the minister's home country.
I
A
Under the FSIA, a foreign state is immune from the jurisdiction of courts in this country unless one of several enumerated exceptions to immunity applies. 28 U.S.C. §§ 1604, 1605 - 1607. If a suit falls within one of these exceptions, the FSIA provides subject-matter jurisdiction in federal district courts. § 1330(a). The *1054 FSIA also provides for personal jurisdiction "where service has been made under section 1608." § 1330(b).
Section 1608(a) governs service of process on "a foreign state or political subdivision of a foreign state." § 1608(a) ; Fed. Rule Civ. Proc. 4(j)(1). In particular, it sets out in hierarchical order the following four methods by which "[s]ervice ... shall be made." 28 U.S.C. § 1608(a). The first method is by delivery of a copy of the summons and complaint "in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision." § 1608(a)(1). "[I]f no special arrangement exists," service may be made by the second method, namely, delivery of a copy of the summons and complaint "in accordance with an applicable international convention on service of judicial documents." § 1608(a)(2). If service is not possible under either of the first two methods, the third method, which is the one at issue in this case, may be used. This method calls for
"sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned ." § 1608(a)(3) (emphasis added).
Finally, if service cannot be made within 30 days under § 1608(a)(3), service may be effected by sending the service packet "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia," for transmittal "through diplomatic channels to the foreign state." § 1608(a)(4).
Once served, a foreign state or political subdivision has 60 days to file a responsive pleading. § 1608(d). If the foreign state or political subdivision does not do this, it runs the risk of incurring a default judgment. See § 1608(e). A copy of any such default judgment must be "sent to the foreign state or political subdivision in the [same] manner prescribed for service." Ibid.
B
On October 12, 2000, the USS Cole , a United States Navy guided-missile destroyer, entered the harbor of Aden, Yemen, for what was intended to be a brief refueling stop. While refueling was underway, a small boat drew along the side of the Cole , and the occupants of the boat detonated explosives that tore a hole in the side of the Cole . Seventeen crewmembers were killed, and dozens more were injured. Al Qaeda later claimed responsibility for the attack.
Respondents in this case are victims of the USS Cole bombing and their family members. In 2010, respondents sued petitioner, the Republic of Sudan, alleging that Sudan had provided material support to al Qaeda for the bombing. See 28 U.S.C. §§ 1605A(a)(1), (c). Because respondents brought suit under the FSIA, they were required to serve Sudan with process under § 1608(a). It is undisputed that service could not be made under § 1608(a)(1) or § 1608(a)(2), and respondents therefore turned to § 1608(a)(3). At respondents' request, the clerk of the court sent the service packet, return receipt requested, to: "Republic of Sudan, Deng Alor Koul, Minister of Foreign Affairs, Embassy of the Republic of Sudan, 2210 Massachusetts Avenue NW, Washington, DC 20008." App. 172. The clerk certified that the service packet had been sent and, a few days later, certified that a signed receipt had been *1055 returned.[1] After Sudan failed to appear in the litigation, the District Court for the District of Columbia held an evidentiary hearing and entered a $314 million default judgment against Sudan. Again at respondents' request, the clerk of the court mailed a copy of the default judgment in the same manner that the clerk had previously used. See § 1608(e).
With their default judgment in hand, respondents turned to the District Court for the Southern District of New York, where they sought to register the judgment and satisfy it through orders requiring several banks to turn over Sudanese assets. See 28 U.S.C. § 1963 (providing for registration of judgments for enforcement in other districts). Pursuant to § 1610(c), the District Court entered an order confirming that a sufficient period of time had elapsed following the entry and notice of the default judgment, and the court then issued three turnover orders.
At this point, Sudan made an appearance for the purpose of contesting jurisdiction. It filed a notice of appeal from each of the three turnover orders and contended on appeal that the default judgment was invalid for lack of personal jurisdiction. In particular, Sudan maintained that § 1608(a)(3) required that the service packet be sent to its foreign minister at his principal office in Khartoum, the capital of Sudan, and not to the Sudanese Embassy in the United States.
The Court of Appeals for the Second Circuit rejected this argument and affirmed the orders of the District Court. 802 F.3d 399 (2015). The Second Circuit reasoned that, although § 1608(a)(3) requires that a service packet be mailed "to the head of the ministry of foreign affairs of the foreign state concerned," the statute "is silent as to a specific location where the mailing is to be addressed." Id., at 404. In light of this, the court concluded that "the method chosen by plaintiffs-a mailing addressed to the minister of foreign affairs at the embassy-was consistent with the language of the statute and could reasonably be expected to result in delivery to the intended person." Ibid.
Sudan filed a petition for rehearing, and the United States filed an amicus curiae brief in support of Sudan's petition. The panel ordered supplemental briefing and heard additional oral argument, but it once again affirmed, reiterating its view that § 1608(a)(3)"does not specify that the mailing be sent to the head of the ministry of foreign affairs in the foreign country." 838 F.3d 86, 91 (CA2 2016). The court thereafter denied Sudan's petition for rehearing en banc.
Subsequent to the Second Circuit's decision, the Court of Appeals for the Fourth Circuit held in a similar case that § 1608(a)(3)"does not authorize delivery of service to a foreign state's embassy even if it correctly identifies the intended recipient as the head of the ministry of foreign affairs." Kumar v. Republic of Sudan , 880 F.3d 144, 158 (2018), cert. pending, No. 17-1269.
We granted certiorari to resolve this conflict. 585 U.S. ----, 138 S.Ct. 2671, 201 L.Ed.2d 1070 (2018)
II
A
The question before us concerns the meaning of § 1608(a)(3), and in interpreting *1056 that provision, "[w]e begin 'where all such inquiries must begin: with the language of the statute itself.' " Caraco Pharmaceutical Laboratories, Ltd. v. Novo Nordisk A/S , 566 U.S. 399, 412, 132 S.Ct. 1670, 182 L.Ed.2d 678 (2012) (quoting United States v. Ron Pair Enterprises, Inc. , 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989) ). As noted, § 1608(a)(3) requires that service be sent "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned."
The most natural reading of this language is that service must be mailed directly to the foreign minister's office in the foreign state. Although this is not, we grant, the only plausible reading of the statutory text, it is the most natural one. See, e.g., United States v. Hohri , 482 U.S. 64, 69-71, 107 S.Ct. 2246, 96 L.Ed.2d 51 (1987) (choosing the "more natural" reading of a statute); ICC v. Texas , 479 U.S. 450, 456-457, 107 S.Ct. 787, 93 L.Ed.2d 809 (1987) (same); see also Florida Dept. of Revenue v. Piccadilly Cafeterias, Inc. , 554 U.S. 33, 41, 128 S.Ct. 2326, 171 L.Ed.2d 203 (2008) (similar).
A key term in § 1608(a)(3) is the past participle "addressed." A letter or package is "addressed" to an intended recipient when his or her name and "address" is placed on the outside of the item to be sent. And the noun "address," in the sense relevant here, means "the designation of a place (as a residence or place of business) where a person or organization may be found or communicated with." Webster's Third New International Dictionary 25 (1971) (Webster's Third); see also Webster's Second New International Dictionary 30 (1957) ("the name or description of a place of residence, business, etc., where a person may be found or communicated with"); Random House Dictionary of the English Language 17 (1966) ("the place or the name of the place where a person, organization, or the like is located or may be reached"); American Heritage Dictionary 15 (1969) ("[t]he location at which a particular organization or person may be found or reached"); Oxford English Dictionary 106 (1933) (OED) ("the name of the place to which any one's letters are directed"). Since a foreign nation's embassy in the United States is neither the residence nor the usual place of business of that nation's foreign minister and is not a place where the minister can customarily be found, the most common understanding of the minister's "address" is inconsistent with the interpretation of § 1608(a)(3) adopted by the court below and advanced by respondents.
We acknowledge that there are circumstances in which a mailing may be "addressed" to the intended recipient at a place other than the individual's residence or usual place of business. For example, if the person sending the mailing does not know the intended recipient's current home or business address, the sender might use the intended recipient's last known address in the hope that the mailing will be forwarded. Or a sender might send a mailing to a third party who is thought to be in a position to ensure that the mailing is ultimately received by the intended recipient. But in the great majority of cases, addressing a mailing to X means placing on the outside of the mailing both X's name and the address of X's residence or customary place of work.
Section 1608(a)(3)'s use of the term "dispatched" points in the same direction. To "dispatch" a communication means "to send [it] off or away (as to a special destination) with promptness or speed often as a matter of official business." Webster's Third 653; see also OED
*1057 478 ("To send off post-haste or with expedition or promptitude (a messenger, message, etc., having an express destination)"). A person who wishes to "dispatch" a letter to X will generally send it directly to X at a place where X is customarily found. The sender will not "dispatch" the letter in a roundabout way, such as by directing it to a third party who, it is hoped, will then send it on to the intended recipient.
A few examples illustrate this point. Suppose that a person is instructed to "address" a letter to the Attorney General of the United States and "dispatch" the letter (i.e. , to "send [it] off post-haste") to the Attorney General. The person giving these instructions would likely be disappointed and probably annoyed to learn that the letter had been sent to, let us say, the office of the United States Attorney for the District of Idaho. And this would be so even though a U.S. Attorney's office is part of the Department headed by the Attorney General and even though such an office would very probably forward the letter to the Attorney General's office in Washington. Similarly, a person who instructs a subordinate to dispatch a letter to the CEO of a big corporation that owns retail outlets throughout the country would probably be irritated to learn that the letter had been mailed to one of those stores instead of corporate headquarters. To "dispatch" a letter to an addressee connotes sending it directly.
A similar understanding underlies the venerable "mailbox rule." As first-year law students learn in their course on contracts, there is a presumption that a mailed acceptance of an offer is deemed operative when "dispatched" if it is "properly addressed." Restatement (Second) of Contracts § 66, p. 161 (1979) (Restatement); Rosenthal v. Walker , 111 U.S. 185, 193, 4 S.Ct. 382, 28 L.Ed. 395 (1884). But no acceptance would be deemed properly addressed and dispatched if it lacked, and thus was not sent to, the offeror's address (or an address that the offeror held out as the place for receipt of an acceptance). See Restatement § 66, Comment b .
It is also significant that service under § 1608(a)(3) requires a signed returned receipt, a standard method for ensuring delivery to the addressee. Cf. Black's Law Dictionary 1096 (10th ed. 2014) (defining "certified mail" as "[m]ail for which the sender requests proof of delivery in the form of a receipt signed by the addressee"). We assume that certified mail sent to a foreign minister will generally be signed for by a subordinate, but the person who signs for the minister's certified mail in the foreign ministry itself presumably has authority to receive mail on the minister's behalf and has been instructed on how that mail is to be handled. The same is much less likely to be true for an employee in the mailroom of an embassy.
For all these reasons, we think that the most natural reading of § 1608(a)(3) is that the service packet must bear the foreign minister's name and customary address and that it be sent to the minister in a direct and expeditious way. And the minister's customary office is the place where he or she generally works, not a farflung outpost that the minister may at most occasionally visit.
B
Several related provisions in § 1608 support this reading. See Davis v. Michigan Dept. of Treasury , 489 U.S. 803, 809, 109 S.Ct. 1500, 103 L.Ed.2d 891 (1989) ("It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme").
*1058 1
One such provision is § 1608(b)(3)(B). Section 1608(b) governs service on "an agency or instrumentality of a foreign state." And like § 1608(a)(3), § 1608(b)(3)(B) requires delivery of a service packet to the intended recipient "by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court." But § 1608(b)(3)(B), unlike § 1608(a)(3), contains prefatory language saying that service by this method is permissible "if reasonably calculated to give actual notice."
Respondents read § 1608(a)(3) as embodying a similar requirement. See Brief for Respondents 34. At oral argument, respondents' counsel stressed this point, arguing that respondents' interpretation of § 1608(a)(3)"gives effect" to the "familiar" due process standard articulated in Mullane v. Central Hanover Bank & Trust Co. , 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950), which is "the notion that [service] must be reasonably calculated to give notice." Tr. of Oral Arg. 37-38.
This argument runs up against two well-settled principles of statutory interpretation. First, "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." Department of Homeland Security v . MacLean , 574 U.S. ----, ----, 135 S.Ct. 913, 919, 190 L.Ed.2d 771 (2015). Because Congress included the "reasonably calculated to give actual notice" language only in § 1608(b), and not in § 1608(a), we resist the suggestion to read that language into § 1608(a). Second, "we are hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." Mackey v. Lanier Collection Agency & Service, Inc. , 486 U.S. 825, 837, 108 S.Ct. 2182, 100 L.Ed.2d 836 (1988). Here, respondents encounter a superfluity problem when they argue that the "addressed and dispatched" clause in § 1608(a)(3) gives effect to the Mullane due process standard. They fail to account for the fact that § 1608(b)(3)(B) contains both the "addressed and dispatched" and "reasonably calculated to give actual notice" requirements. If respondents were correct that "addressed and dispatched" means "reasonably calculated to give notice," then the phrase "reasonably calculated to give actual notice" in § 1608(b)(3) would be superfluous. Thus, as the dissent agrees, § 1608(a)(3)"does not deem a foreign state properly served solely because the service method is reasonably calculated to provide actual notice." Post, at ----(opinion of THOMAS, J.).
2
Section 1608(b)(2) similarly supports our interpretation of § 1608(a)(3). Section 1608(b)(2) provides for delivery of a service packet to an officer or a managing or general agent of the agency or instrumentality of a foreign state or "to any other agent authorized by appointment or by law to receive service of process in the United States."
This language is significant for three reasons. First, it expressly allows service on an agent. Second, it specifies the particular individuals who are permitted to be served as agents of the recipient. Third, it makes clear that service on the agent may occur in the United States if an agent here falls within the provision's terms.
If Congress had contemplated anything similar under § 1608(a)(3), there is no apparent reason why it would not have included in that provision terms similar to those in § 1608(b)(2). Respondents would have us believe that Congress was content to have the courts read such terms into § 1608(a)(3). In view of § 1608(b)(2), this *1059 seems unlikely.[2] See also post, at ---- ("Nor does the FSIA authorize service on a foreign state by utilizing an agent designated to receive process for the state").
3
Section 1608(c) further buttresses our reading of § 1608(a)(3). Section 1608(c) sets out the rules for determining when service "shall be deemed to have been made." For the first three methods of service under § 1608(a), service is deemed to have occurred on the date indicated on "the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed." § 1608(c)(2). The sole exception is service under § 1608(a)(4), which requires the Secretary of State to transmit a service packet to the foreign state through diplomatic channels. Under this method, once the Secretary has transmitted the packet, the Secretary must send to the clerk of the court "a certified copy of the diplomatic note indicating when the papers were transmitted." § 1608(a)(4). And when service is effected in this way, service is regarded as having occurred on the transmittal date shown on the certified copy of the diplomatic note. § 1608(c)(1).
Under all these methods, service is deemed to have occurred only when there is a strong basis for concluding that the service packet will very shortly thereafter come into the hands of a foreign official who will know what needs to be done. Under § 1608(a)(4), where service is transmitted by the Secretary of State through diplomatic channels, there is presumably good reason to believe that the service packet will quickly come to the attention of a high-level foreign official, and thus service is regarded as having been completed on the date of transmittal. And under §§ 1608(a)(1), (2), and (3), where service is deemed to have occurred on the date shown on a document signed by the person who received it from the carrier, Congress presumably thought that the individuals who signed for the service packet could be trusted to ensure that the service packet is handled properly and expeditiously.
It is easy to see why Congress could take that view with respect to a person designated for the receipt of process in a "special arrangement for service between the plaintiff and the foreign state or political subdivision," § 1608(a)(1), and a person so designated under "an applicable international convention," § 1608(a)(2). But what about § 1608(a)(3), the provision now before us? Who is more comparable to those who sign for mail under §§ 1608(a)(1) and (2) ? A person who works in the office of the foreign minister in the minister's home country and is authorized to receive and process the minister's mail? Or a mailroom employee in a foreign embassy? We think the answer is obvious, and therefore interpreting § 1608(a)(3) to require that a service packet be sent to a foreign minister's own office better harmonizes the rules for determining when service is deemed to have been made.
Respondents seek to soften the blow of an untimely delivery to the minister by noting that the foreign state can try to vacate a default judgment under Federal Rule of Civil Procedure 55(c). Brief for Respondents 27. But that is a poor substitute for sure and timely receipt of service, *1060 since a foreign state would have to show "good cause" to vacate the judgment under that Rule. Here, as with the previously mentioned provisions in § 1608, giving § 1608(a)(3) its ordinary meaning better harmonizes the various provisions in § 1608 and avoids the oddities that respondents' interpretation would create.
C
The ordinary meaning of the "addressed and dispatched" requirement in § 1608(a)(3) also has the virtue of avoiding potential tension with the Federal Rules of Civil Procedure and the Vienna Convention on Diplomatic Relations.
1
Take the Federal Rules of Civil Procedure first. At the time of the FSIA's enactment, Rule 4(i), entitled "Alternative provisions for service in a foreign-country," set out certain permissible methods of service on "part[ies] in a foreign country." Fed. Rule Civ. Proc. 4(i)(1) (1976). One such method was "by any form of mail, requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the party to be served ." Rule 4(i)(1)(D) (emphasis added). Rule 4(i)(2) further provided that "proof of service" pursuant to that method "shall include a receipt signed by the addressee or other evidence of delivery to the addressee satisfactory to the court." (Emphasis added.) The current version of Rule 4 is similar. See Rules 4(f)(2)(C)(ii), 4(l )(2)(B).
The virtually identical methods of service outlined in Rule 4 and § 1608(a)(3) pose a problem for respondents' position: If mailing a service packet to a foreign state's embassy in the United States were sufficient for purposes of § 1608(a)(3), then it would appear to be easier to serve the foreign state than to serve a person in that foreign state. This is so because a receipt signed by an embassy employee would not necessarily satisfy Rule 4 since such a receipt would not bear the signature of the foreign minister and might not constitute evidence that is sufficient to show that the service packet had actually been delivered to the minister. It would be an odd state of affairs for a foreign state's inhabitants to enjoy more protections in federal courts than the foreign state itself, particularly given that the foreign state's immunity from suit is at stake. The natural reading of § 1608(a)(3) avoids that oddity.
2
Our interpretation of § 1608(a)(3) avoids concerns regarding the United States' obligations under the Vienna Convention on Diplomatic Relations. We have previously noted that the State Department "helped to draft the FSIA's language," and we therefore pay "special attention" to the Department's views on sovereign immunity. Bolivarian Republic of Venezuelav . Helmerich & Payne Int'l Drilling Co. , 581 U.S. ----, ----, 137 S.Ct. 1312, 1320, 197 L.Ed.2d 663 (2017). It is also "well settled that the Executive Branch's interpretation of a treaty 'is entitled to great weight.' " Abbott v. Abbott , 560 U.S. 1, 15, 130 S.Ct. 1983, 176 L.Ed.2d 789 (2010) (quoting Sumitomo Shoji America, Inc. v. Avagliano , 457 U.S. 176, 185, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982) ).
Article 22(1) of the Vienna Convention provides: "The premises of the mission shall be inviolable. The agents of the receiving State may not enter them, except with the consent of the head of the mission." Vienna Convention on Diplomatic Relations, Apr. 18, 1961, 23 U.S.T. 3237, T.I.A.S. No. 7502. Since at least 1974, the State Department has taken the position that Article 22(1)'s principle of inviolability precludes serving a foreign state by mailing process to the foreign state's embassy *1061 in the United States. See Service of Legal Process by Mail on Foreign Governments in the United States, 71 Dept. State Bull. 458-459 (1974). In this case, the State Department has reiterated this view in amicus curiae briefs filed in this Court and in the Second Circuit. The Government also informs us that United States embassies do not accept service of process when the United States is sued in a foreign court, and the Government expresses concern that accepting respondents' interpretation of § 1608 might imperil this practice. Brief for United States as Amicus Curiae 25-26.
Contending that the State Department held a different view of Article 22(1) before 1974, respondents argue that the Department's interpretation of the Vienna Convention is wrong, but we need not decide this question. By giving § 1608(a)(3) its most natural reading, we avoid the potential international implications of a contrary interpretation.
III
Respondents' remaining arguments do not alter our conclusion. First, respondents contend that § 1608(a)(3) says nothing about where the service packet must be sent. See Brief for Respondents 22 ("the statute is silent as to the location where the service packet should be sent"). But while it is true that § 1608(a)(3) does not expressly provide where service must be sent, it is common ground that this provision must implicitly impose some requirement. Respondents acknowledge this when they argue that the provision demands that service be sent "to a location that is likely to have a direct line of communication to the foreign minister." Id., at 34; cf. post, at ---- (stating that sending a letter to a Washington-based embassy "with a direct line of communication" to the foreign minister seems as efficient as sending it to the minister's office in the foreign state). The question, then, is precisely what § 1608(a)(3) implicitly requires. Respondents assure us that a packet sent to "an embassy plainly would qualify," while a packet sent to "a tourism office plainly would not." Brief for Respondents 34. But if the test is whether "a location ... is likely to have a direct line of communication to the foreign minister," ibid. , it is not at all clear why service could not be sent to places in the United States other than a foreign state's embassy. Why not allow the packet to be sent, for example, to a consulate? The residence of the foreign state's ambassador? The foreign state's mission to the United Nations? Would the answer depend on the size or presumed expertise of the staff at the delivery location? The difficult line-drawing problems that flow from respondents' interpretation of § 1608(a)(3) counsel in favor of maintaining a clear, administrable rule: The service packet must be mailed directly to the foreign minister at the minister's office in the foreign state.
Second, respondents (and the dissent, see post, at ---- - ----) contrast the language of § 1608(a)(3) with that of § 1608(a)(4), which says that service by this method requires that process be sent to the Secretary of State in "Washington, District of Columbia." If Congress wanted to require that process under § 1608(a)(3) be sent to a foreign minister's office in the minister's home country, respondents ask, why didn't Congress use a formulation similar to that in § 1608(a)(4) ? This is respondents' strongest argument, and in the end, we see no entirely satisfactory response other than that § 1608(a) does not represent an example of perfect draftsmanship. We grant that the argument based on the contrasting language in § 1608(a)(4) cuts in respondents' favor, but it is outweighed in our judgment by the countervailing arguments already noted.
*1062 Finally, respondents contend that it would be "the height of unfairness to throw out [their] judgment" based on the highly technical argument belatedly raised by petitioner. See Brief for Respondents 35. We understand respondents' exasperation and recognize that enforcing compliance with § 1608(a)(3) may seem like an empty formality in this particular case, which involves highly publicized litigation of which the Government of Sudan may have been aware prior to entry of default judgment. But there are circumstances in which the rule of law demands adherence to strict requirements even when the equities of a particular case may seem to point in the opposite direction. The service rules set out in § 1608(a)(3), which apply to a category of cases with sensitive diplomatic implications, clearly fall into this category. Under those rules, all cases must be treated the same.
Moreover, as respondents' counsel acknowledged at oral argument, holding that Sudan was not properly served under § 1608(a)(3) is not the end of the road. Tr. of Oral Arg. 56. Respondents may attempt service once again under § 1608(a)(3), and if that attempt fails, they may turn to § 1608(a)(4). When asked at argument to provide examples of any problems with service under § 1608(a)(4), respondents' counsel stated that he was unaware of any cases where such service failed. Id., at 59-62.
* * *
We interpret § 1608(a)(3) as it is most naturally understood: A service packet must be addressed and dispatched to the foreign minister at the minister's office in the foreign state. We therefore reverse the judgment of the Court of Appeals and remand the case for further proceedings consistent with this opinion.
It is so ordered.

Sudan questions whether respondents named the correct foreign minister and whether the Sudanese Embassy received the service packet. Because we find the service deficient in any event, we assume for the sake of argument that the correct name was used and that the Embassy did receive the packet.

Notably, the idea of treating someone at a foreign state's embassy as an agent for purposes of service on the foreign state was not unfamiliar to Congress. An earlier proposed version of the FSIA would have permitted service on a foreign state by sending the service packet "to the ambassador or chief of mission of the foreign state." See S. 566, 93d Cong., 1st Sess., § 1608, p. 6 (1973).