[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-16748

_____

D.C. Docket No. 1:14-cv-24414-KMW

CARMINA R. COMPARELLI,
JULIO C. DELGADO COMPARELLI,

                                        Plaintiffs - Appellants,

FREDDY E. LOPEZ COMPARELLI, et al.,

                                        Plaintiffs,

versus

REPUBLICA BOLIVARIANA DE VENEZUELA,
a sovereign nation,
PETROQUIMICA DE VENEZUELA, S.A.,
an agency or instrumentality of the Bolivarian
Republic of Venezuela,
INTERNATIONAL PETROCHEMICAL
SALES, LTD.,

                                        Defendants - Appellees.

———————————————

Appeal from the United States District Court
for the Southern District of Florida

———————————————

(June 8, 2018)

Before JORDAN, HULL, and BOGGS,[*] Circuit Judges.

JORDAN, Circuit Judge:

Carmina Comparelli and Julio Delgado Comparelli sued the República Bolivariana de Venezuela and Petroquimica de Venezuela, S.A., alleging unlawful expropriation of their property in violation of international law.  The district court dismissed their complaint for lack of subject-matter jurisdiction and denied their motion for leave *nunc pro tunc* to file an amended complaint.  The Comparellis appealed.

While the case was pending here, the Supreme Court issued an opinion detailing the showing that plaintiffs such as the Comparellis must make in order to have jurisdiction over a foreign state in United States courts under the expropriation (i.e., takings) exception of the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(3).  *See Bolivarian Republic of Venezuela, et al. v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312 (2017).  This new standard leaves us with several questions that the district court did not (and likely did not think it had to)

———————————————

[*] The Honorable Danny J. Boggs, United States Circuit Judge for the Sixth Circuit, sitting by designation.

2

answer.  Under the circumstances, we believe that the district court is best suited to resolve those questions in the first instance.  And so, after careful review of the parties' briefs and the entire record, and with the benefit of oral argument, we reverse and remand for further proceedings.

## I. BACKGROUND

The Comparellis alleged the following facts in their complaint.  Because they share a last name, we refer to them by their first names.

### A. THE SEIZURE OF MARIVELCA IN VENEZUELA

Carmina was born in Italy and moved to Venezuela at a young age.  She has resided in Venezuela most of her life and is the sole shareholder of a Venezuelan company, Marivelca, C.A.[1]

Marivelca sold chemical products and raw materials in the alimentary, petroleum, and petrochemical industries. Carmina's son, Julio, born in Venezuela, wholly owns Inversiones Trans Benz, C.A., the "trucking arm" of Marivelca.  Both Marivelca and Trans Benz worked closely with Venezuela's public sector and its

---

[1] The original complaint states that Carmina, Julio, Freddy Comparelli, and Loryelena Comparelli each owned a 25% stake of Marivelca.  The Comparellis' attorney acknowledged that this was an error and attempted to correct it by filing an amended complaint alleging that Carmina owned 100% of Marivelca.  Although the district court struck the amended complaint, the original complaint includes an exhibit which suggests—at this stage of the litigation—that Carmina is the sole shareholder of Marivelca.  Exhibits control over conflicting allegations in a pleading, so for the purposes of this opinion we consider Carmina as the sole shareholder of Marivelca despite the contrary allegation in the original complaint. *See Friedman v. Market St. Mortg. Corp.*, 520 F.3d 1289, 1295 n.6 (11th Cir. 2008) ("Where there is a conflict between allegations in a pleading and exhibits thereto, it is well settled that the exhibits control.") (quoting *Tucker v. Nat'l Linen Serv. Corp.*, 200 F.2d 858, 865 (5th Cir. 1973)).

state-owned and operated businesses, including Petroquimica de Venezuela, S.A. ("Pequiven"), a nationalized Venezuelan company engaged in the domestic production and sale of petrochemical products.

Marivelca operated as part of Pequiven's network of certified distributors of hydrochloric acid for legal industrial applications. Pequiven would deliver hydrochloric acid to Marivelca at certain storage locations that Marivelca owned or leased. From those storage locations, Marivelca would transport the hydrochloric acid to other sites beyond Pequiven's direct distribution zone.[2]

As part of its delivery network, Marivelca leased storage space from Suplidora del Caribe, C.A., a company headquartered in Maracaibo, Venezuela. Marivelca used the leased space from Suplidora to temporarily store hydrochloric acid that it acquired from Pequiven.

In June of 2008, the Public Ministry of the State of Zulia (a Venezuelan state) began investigating Suplidora. During this investigation, on August 8, 2008, the Anti-Drug Division of the Bolivarian National Guard of Venezuela conducted a warrantless search of Marivelca's headquarters for the suspected illicit storage of controlled chemical substances, as defined in Article 31 of Venezuela's Organic

---

[2] Hydrochloric acid is a highly corrosive, strong mineral acid with several industrial uses. Because it is also used in the production of heroin, cocaine, and methamphetamine, it is listed as a Table II controlled drug precursor under the 1988 United Nations Convention Against Illicit Trafficking in Narcotic Drugs and Psychotropic Substances. *See* UN Economic and Social Council (ECOSOC), United Nations Convention Against Illicit Traffic in Narcotic Drugs and Psychotropic Substances, 19 December 1988.

4

Law Against Illicit Traffic and Consumption of Narcotics and Psychotropic Substances. After this search, the National Guard reported that Marivelca maintained a surplus of about three million pounds of hydrochloric acid that it had not disclosed to Venezuelan authorities. On October 20, 2008, the National Anti-Drug Office conducted another warrantless search of Marivelca's facilities, at the request of the prosecutor's office in Zulia.

About two years later, in August of 2010, Venezuela charged the Comparellis with illicit storage of controlled chemical substances in violation of Article 31, and criminal conspiracy in violation of Article 6 of Venezuela's Organic Law Against Organized Crime. In November of 2010, Venezuela seized Marivelca and its assets and appointed Pequiven as the "special administrator" of Marivelca.

The original complaint, rife with allegations about corruption in Venezuela's political and judicial branches, asserts that Venezuela initiated the criminal proceeding as a pretext to further an illicit scheme to expropriate Marivelca. The Comparellis allege that they filed pleadings in September of 2010, December of 2010, and January of 2011 in response to the criminal charges, but claim that these pleadings were ignored by Venezuela so that it could "put [the case] at sleep . . . for the sole purpose of furthering the illicit scheme." The Comparellis also

5

submitted a petition for extraordinary relief (an "avocamiento") to the Venezuela Supreme Court, but that too was rejected, over the dissent of one justice.

A physical audit of Marivelca's purchases, sales, and inventory—conducted in December of 2010—revealed a surplus of only 903 pounds of hydrochloric acid, an amount within the normal tolerance margins associated with the weighing of bulk purchases of the acid. The Comparellis sent the results of this audit to the prosecutor in January of 2011. Instead of providing any relief, the Venezuelan government sought and obtained arrest warrants for Carmina and Julio. Around this time (the complaint does not say exactly when), the Comparellis fled Venezuela for Costa Rica.

## B. THE LAWSUIT

On November 19, 2014, Carmina and Julio, together with Freddy and Loryelena Comparelli, filed a "Complaint for Claims Pursuant to 28 U.S.C. § 1350" (the Alien Tort Statute) against Venezuela and Pequiven. This original complaint alleged that, through the conduct described above, Venezuela and Pequiven (an alleged "agency or instrumentality" of Venezuela) unlawfully expropriated the Comparellis' assets in violation of "the applicable law of nations and of conventional and customary international law." The complaint alleged violations of the American Convention on Human Rights (1144 U.N.T.S. 129 (1969)), the American Declaration of the Rights and Duties of Man (O.A.S. Res.

6

XXX (1948)), the International Covenant on Civil and Political Rights (999 U.N.T.S. 171 (1967)), the Universal Declaration of Human Rights (G.A. Res. 217A, U.N. Doc. A/810 at 71 (1948)), and United Nations General Assembly Resolution 3281. The Comparellis specifically asserted jurisdiction under the expropriation exception of the FSIA, 28 U.S.C. § 1605(a)(3).

Venezuela and Pequiven moved to dismiss the Comparellis' original complaint. After receiving an extension of time to respond to the motions to dismiss, Carmina and Julio (but not Freddy and Loryelena) filed an amended complaint rather than a response to the motions. The amended complaint alleged the same wrongful expropriation, removed a reference to the ATS, corrected Marivelca's ownership, added that Carmina and Julio currently reside in Miami-Dade County, Florida, and sought to add an additional defendant, International Petrochemical Sales, Ltd. A week later, Carmina and Julio filed a motion for leave *nunc pro tunc* to re-file their amended complaint, requesting that the district court treat it as the operative pleading in the case. Venezuela and Pequiven opposed the motion and separately moved to dismiss the amended complaint.

The district court issued a summary omnibus order (1) denying the motion for leave to file an amended complaint *nunc pro tunc*; (2) striking the amended complaint; and (3) ordering the Comparellis to respond to the original motions to dismiss. Freddy and Loryelena Comparelli voluntarily dismissed their claims.

7

Carmina and Julio continued pursuing their claim for unlawful expropriation and filed a response opposing the motions to dismiss the original complaint six days later.

On September 23, 2016, the district court granted the motions to dismiss. It categorized the Comparellis' claim in the original complaint as arising under the ATS, not under § 1605(a)(3) of the FSIA. Applying ATS case law and the presumption against extraterritoriality, *see generally Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 115 (2013), it ruled that federal courts do not have jurisdiction over an ATS claim when it "involves a foreign plaintiff suing a foreign defendant where 'all relevant conduct' occurred on foreign soil (a so-called 'foreign-cubed' case)." D.E. 75 at 4. Describing the facts of the case as a "quintessential 'foreign-cubed' case," with foreign nationals suing foreign sovereigns over conduct that occurred abroad, the district court determined that it lacked subject-matter jurisdiction and dismissed the case.

## II. STANDARD OF REVIEW

We review *de novo* questions of subject-matter jurisdiction. *See Doe v. Drummond Co., Inc.*, 782 F.3d 576, 593 (11th Cir. 2015). We likewise review *de novo* the applicability of the act of state doctrine to the Comparellis' claims. *See Mezerhane v. República Bolivariana de Venezuela*, 785 F.3d 545, 548 (11th Cir. 2015).

8

### III.  THE FOREIGN SOVEREIGN IMMUNITIES ACT

As noted earlier, the Comparellis' attorney made some errors in the original complaint that led to the filing of the stricken amended complaint.  Because the amended complaint was never the operative pleading, we only consider the original complaint.  We treat Carmina as the sole shareholder of Marivelca due to the exhibit attached to the original complaint, which governs over the conflicting allegation of ownership in the complaint.  *See Friedman*, 520 F.3d at 1295 n.6.

The original complaint cites the ATS in its caption, but that reference does not preclude us from recognizing that the Comparellis invoked jurisdiction under the FSIA's expropriation exception.  First, "although captions provide helpful guidance to the court, they are not determinative as to the parties to the action or the court's jurisdiction."  *Lundgren v. McDaniel*, 814 F.2d 600, 604 n.2 (11th Cir. 1987).  Second, aside from the reference to the ATS in the caption, the remainder of the complaint makes explicit reference to, sets out the elements of, and alleges facts relating to § 1605(a)(3), the FSIA expropriation exception.  Of particular note, paragraph nine prominently states that the court "has jurisdiction over Venezuela and Pequiven pursuant to 28 U.S.C. § 1605(a)(3)."  Third, all parties briefed the applicability of the FSIA's expropriation exception in the district court and on appeal, indicating that they understand its relevance.

The FSIA is "the sole basis for obtaining jurisdiction over a foreign state in our courts." *Mezerhane*, 785 F.3d at 548 (quoting *Argentine Republic. v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989)). Under the FSIA, "a foreign state is immune from the jurisdiction of the United States unless an FSIA statutory exemption is applicable." *Calzadilla v. Banco Latino Internacional*, 413 F.3d 1285, 1296 (11th Cir. 2005) (citation and internal quotation marks omitted). If no exception applies, the district court lacks subject-matter jurisdiction. *See Verlinden B.V. v. Cen. Bank of Nigeria*, 461 U.S. 480, 489 (1983); *Mezerhane*, 785 F.3d at 548. The FSIA is a jurisdictional statute; it "does not create or modify any causes of action." *Republic of Austria v. Altmann*, 541 U.S. 677, 695 n.15 (2004).

The Comparellis argue that jurisdiction exists under the expropriation exception of the FSIA. That exception, codified at § 1605(a)(3), provides that immunity does not apply in any case "in which rights in property taken in violation of international law are in issue." Under this exception, "expropriation is a uniquely sovereign act, as opposed to a private act." *Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1228 (11th Cir. 2018). To fall within its coverage, the Comparellis must show (1) that rights in property are at issue; (2) that property was taken; (3) that the taking was in violation of international law; and (4) that at least one of the two statutory nexus requirements are satisfied. *See* § 1605(a)(3). *See also Zappia Middle East Const. Co. v. Emirate of Abu Dhabi*,

10

215 F.3d 247, 251 (2d Cir. 2000).  The nexus requirement is satisfied if the property in question or any property exchanged for such property is either (a) "present in the United States in connection with a commercial activity carried on in the United States by the foreign state;" or (b) "owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States."  § 1605(a)(3).  *See also Garb v. Republic of Poland*, 440 F.3d 579, 588 (2d Cir. 2006).

After briefing in this appeal was concluded, but before oral argument, the Supreme Court issued its decision in *Helmerich*, which considered what showing a party must make to establish a federal court's jurisdiction over a foreign sovereign under the FSIA's expropriation exception.  A unanimous Supreme Court held that "a party's nonfriviolous, but ultimately incorrect, argument that property was taken in violation of international law is insufficient to confer jurisdiction."  137 S. Ct. at 1316.  Instead, "the relevant factual allegations must make out a legally valid claim that a certain kind of right is at issue (*property* rights) and that the relevant property was taken in a certain way (in violation of international law).  A good argument to that effect is not sufficient."  *Id*.  *See also id.* at 1318 ("In our view, the expropriation exception grants jurisdiction only where there is a valid claim that 'property' has been 'taken in violation of international law.'").

This standard notably departs from the usual pleading standards applied on a Rule 12(b)(6) motion to dismiss, where a plaintiff's factual allegations are taken as true. *See, e.g.*, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish jurisdiction under the expropriation exception, the district court must resolve relevant factual disputes and determine "that the property in which the party claims to hold rights was indeed property taken in violation of international law." *See Helmerich*, 137 S. Ct. at 1316–17. Thus, challenges to jurisdiction under the expropriation exception, like other factual challenges to subject-matter jurisdiction under Rule 12(b)(1), may be resolved by looking to "material extrinsic from the pleadings, such as affidavits or testimony." *Stalley ex rel. U.S. v. Orlando Reg'l Healthcare Sys., Inc.*, 524 F.3d 1229, 1233 (11th Cir. 2008).

## IV.  THE ACT OF STATE DOCTRINE

The act of state doctrine "is a judicially-created rule of decision that 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.'" *Mezerhane*, 785 F.3d at 551–52 (quoting *Glen v. Club Méditerranée, S.A.*, 450 F.3d 1251, 1253 (11th Cir. 2006)). Congress limited the reach of the act of state doctrine in the Second Hickenlooper Amendment, which provides that the doctrine does not apply where a foreign sovereign, acting within its own territory, nevertheless violates international law:

12

[N]o court in the United States shall decline on the ground of the federal act of state doctrine to make a determination on the merits giving effect to the principles of international law in a case in which a claim of title or other right to property is asserted by any party . . . based upon (or traced through) a confiscation or other taking . . . by an act of that state in violation of the principles of international law.

22 U.S.C. § 2370(e)(2).  *See also Mezerhane*, 785 F.3d at 552.[3]

The Second Hickenlooper Amendment sets out three conditions in order for its exception to the act of state doctrine to apply: (1) a claim of title or other right in property, (2) which is based upon or traced through a confiscation or other taking, (3) and committed in violation of international law.  *See FOGADE*, 263 F.3d at 1294.

## V.  APPLICATION OF THE DOMESTIC TAKINGS RULE

Although they are separate jurisdictional rules, the FSIA expropriation exception and the Second Hickenlooper Amendment each require a showing that the alleged taking of Marivelca by Venezuela and Pequiven violated international law.  *See de Sanchez v. Banco Cen. de Nicaragua*, 770 F.2d 1385, 1395 (5th Cir. 1985) ("[T]he Hickenlooper Exception and [§] 1605(a)(3) are congruent.")

---

[3] The Second Hickenlooper Amendment was enacted, in part, as a response to the Supreme Court's decision in *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964).  *Sabbatino* held that the act of state doctrine prevented United States courts from adjudicating a claim that Cuba violated international law by expropriating sugar from a Cuban corporation owned primarily by United States residents.  *See id*. at 428 ("[T]he Judicial Branch will not examine the validity of a taking of property within its own territory by a foreign sovereign government . . . even if . . . the taking violates customary international law.").  *See generally FOGADE v. ENB Revocable Trust*, 263 F.3d 1274, 1293–94 (11th Cir. 2001) (discussing the impact of the Second Hickenlooper Amendment on *Sabbatino*).

13

(citation omitted).  As we explain, showing a violation of international law in a case like this one is no simple matter.

"As a rule, when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law."  *FOGADE*, 263 F.3d at 1294.  "At their core, such claims simply are not international." *Mezerhane*, 785 F.3d at 550.  *See also Beg v. Islamic Republic of Pakistan*, 353 F.3d 1323, 1328 n.3 (11th Cir. 2003) ("International law prohibits expropriation of alien property without compensation, but does not prohibit governments from expropriating property from their own nationals without compensation.").  Therefore, we must first determine whether the so-called "domestic takings rule" bars the Comparellis' claims.

## A. THE CONCEPT OF NATIONALITY

"Nationality is a concept of international law; citizenship is not, but is a concept in the national law of many states.  A citizen under national law is generally a national for purposes of international law, but in some states not all nationals are citizens."  Restatement (Third) of the Foreign Relations Law of the United States § 211 (1987).

International law recognizes that it is generally up to each state (i.e., country) to determine who are its nationals.  *See Stserba v. Holder*, 646 F.3d 964, 973 (6th Cir. 2011) ("The basic rule under international law is that it is within each

state's jurisdiction to decide who are its nationals."); *Dhoumo v. Bd. of Immigration Appeals*, 416 F.3d 172, 175 (2d Cir. 2005) ("Nationality is a status conferred by a state, and will generally be recognized by other states provided it is supported by a 'genuine link' between the individual and the conferring state."); Restatement (Third) of Foreign Relations § 211 ("A state is free to establish nationality law and confer nationality as it sees fit. However, under international law other states need not recognize a nationality that is involuntary [ ] or that is not based on an accepted 'genuine link.'"); Robert D. Sloane, *Breaking the Genuine Link: The Contemporary International Legal Regulation of Nationality*, 50 Harv. Int'l L.J. 1, 2 (2009) ("[I]t is for each State to determine under its own law who are its nationals.") (quoting Convention on Certain Questions Relating to the Conflict of Nationality Laws, The Hague, April 12, 1930). Thus, whether Carmina and Julio are nationals of Venezuela is determined by the laws of Venezuela. Because the parties have not addressed the issue, we have conducted our own preliminary research into Venezuelan law on nationality. *See Cooper v. Meridian Yachts, Ltd.*, 575 F.3d 1151, 1163 n.5 (11th Cir. 2009) ("Rule 44.1 of the Federal Rules of Civil Procedure permits us to conduct independent research on foreign law.").

In Venezuela, "[p]ersons are either Venezuelans or foreigners." Venezuelan Civil Code, Chp. II, Art. 24 (Lawrence Pub. Co., Julio Romañach, Jr. ed. 2016). The Venezuelan Constitution provides specific means of obtaining Venezuelan

15

nationality. *See* Venezuelan Civil Code, Chp. II, Art. 25 ("Venezuelan persons are those declared by the Constitution of the Republic to be such."). Under the Venezuelan Constitution, Venezuelan nationality may be attained either by birth or naturalization. *See* Constitution of Venezuela, Chp. II, Sec. I, Arts. 32 & 33. [4]

## B. CARMINA'S NATIONALITY

Carmina, according to the record before us, is not a Venezuelan national. Her Venezuelan identification card (provided to the district court) establishes that she is an "Extranjer[a]"—a foreigner—and that her nationality is Italian. Likewise, other Venezuelan records list Italy as her birthplace and "Resident" as her current status. Pequiven admits as much, stating that Carmina is "Italian and a legal Venezuelan resident since 1957." Br. of Pequiven at 9.

Venezuelan law does not appear to confer nationality on long-time residents who do not follow the constitutionally-prescribed means to become Venezuelan. *See generally* Venezuelan Civil Code, Chp. II. *See also* Constitution of Venezuela, Chp. II, Sec. I, Art. 33 (providing the procedure to obtain Venezuelan nationality through naturalization). Although Carmina has lived in Venezuela for decades and has significant ties there, it appears that Venezuela does not consider her to be one

---

[4] On remand, the parties may wish to supplement our preliminary assessment of Venezuelan law with other sources explaining, for example, whether Venezuela confers nationality in other circumstances. *See Belleri v. United States*, 712 F.3d 543, 548 (11th Cir. 2013) (remanding to the district court because the parties had not briefed Colombian law question so it could "decide this matter in the first instance, after considering any relevant materials").

16

of its nationals. If this is the case, the domestic takings rule does not bar Carmina's claim.[5]

## C. JULIO'S NATIONALITY

Julio alleged that he is a citizen of Italy. But evidence in the record indicates that he is also a national of Venezuela, having been born in that country. For example, a Venezuelan identity card identifies Julio as "Venezolano." Julio argues that Venezuela is not permitted to go "beyond the four corners of the [c]omplaint . . . to argue that he is a dual citizen of Italy and Venezuela." Br. of Carmina and Julio Comparelli at 12. As *Helmerich* made clear, however, this is no longer the case; courts "may take evidence and resolve factual disputes" to determine the applicability of the expropriation exception. *See Helmerich*, 137 S. Ct. at 1316.

Under the principle of *jus sanguinis*—citizenship based on parents' citizenship—Julio may indeed be a national of Italy because his mother, Carmina, is an Italian national. *See Faddoul v. I.N.S.*, 37 F.3d 185, 189 n.3 (5th Cir. 1994) ("*Jus sanguinis* . . . continues to be the primary basis for citizenship throughout much of Europe, Africa, and the Near East."); Restatement (Third) of Foreign Relations § 211 cmt. c. (stating that both *jus soli*—citizenship based on place of birth—and *jus sanguinis* are "universally accepted" as reflecting genuine links

---

[5] This conclusion is based upon the record currently before us, which includes government records submitted by Venezuela in its motion to dismiss. On remand, jurisdictional discovery may yield other evidence about Carmina's nationality at the time of the alleged expropriation. As *Helmerich* dictates, the district court should resolve any such factual disputes.

between the state and the individual); *Citizenship through Italian parents/ancestors ("iure sanguinis")*, Consolato Generale d'Italia, http://www.consnewyork.esteri.it/ consolato_newyork/en/i_servizi/per-i-cittadini/cittadinanza/iure.html (consulate of Italy describing nationality under principle of *jus sanguinis*) (last visited June 5, 2018).

Venezuela and Pequiven argue that Julio's claims are barred by the domestic takings rule under *FOGADE* and *Mezerhane*.  Neither case, however, analyzed whether the rule extends to a state's expropriation of property belonging to one of its nationals *who is also a national of another country*.  *See FOGADE*, 263 F.3d at 1294 (Venezuelan nationals' claim of expropriation by Venezuelan agency); *Mezerhane*, 785 F.3d at 549 (Venezuelan national's claim of expropriation by Venezuela and Venezuelan government entities).  How to treat a dual national, as Julio appears to be, is a question of first impression for us.

Two district courts have addressed expropriation claims by dual nationals. We discuss both cases below.

In *Wahba v. National Bank of Egypt*, 457 F. Supp. 2d 721 (E.D. Tex. 2006), the court considered the National Bank of Egypt's alleged expropriation of property from an Egypt-U.S. dual national.  The court held that the expropriation exception did not apply because the expropriation did not violate international law. Specifically, the plaintiff "held himself out as an Egyptian," used his Egyptian

passport while traveling, represented in corporate documents with the NBE that he was Egyptian, and "relied on his status as an Egyptian national in his dealings with the NBE." *Id*. at 731–32. Critically, "from the NBE's perspective it was dealing with Egyptian assets owned by Egyptian corporations, the principal agent of which was an Egyptian citizen." *Id*. at 731.

In *Bahgat v. Arab Republic of Egypt*, 2015 WL 13654006 (S.D.N.Y. March 31, 2015), *aff'd on alternative grounds*, 631 F. App'x 69 (2d Cir. 2016), the court considered another alleged expropriation by the NBE of property owned by an Egypt-U.S. dual national. The court engaged in a fact-based inquiry to find that the expropriation exception did not apply. Importantly, the plaintiff was Egyptian-born and held an Egyptian passport, executed a power of attorney in 2012 stating that he was an Egyptian national, filed a declaration stating that he "maintained a more frequent presence in Egypt beginning in 1992," lived primarily in Egypt during the relevant period, and "acted as an Egyptian national during his dealings with the Egyptian government and the NBE." *Id*. at *6.

We find *Wahba* and *Baghat* instructive in determining whether the domestic takings rule should apply in the case of a dual national. In doing so, we decline to announce a broad principle that the rule applies automatically to dual nationals. Rather, the inquiry is fact-based, considering matters such as the relationship between the national and the state which allegedly expropriated the property, how

19

the national—through his words and conduct—characterized himself, and whether the state considered its national as one of its own or as a foreign national. *See Wahba*, 457 F. Supp. 2d at 732; *Baghat*, 2015 WL 13654006, at *6.

This fact-based inquiry is in line with the analysis international courts have used to determine the "dominant and effective nationality" of dual nationals. For example, the Iran-U.S. Claims Tribunal has jurisdiction over claims of United States nationals against Iran, but not claims by Iranian nationals against Iran. Faced with claims by Iran-U.S. dual nationals, the Tribunal determined that it was required by international law to consider "all relevant factors" to determine the "dominant and effective nationality" of those dual national claimants for jurisdictional purposes. *See* Iran-U.S. Claims Tribunal: Decision in Case No. A/18 Concerning the Question of Jurisdiction over Claims of Persons with Dual Nationality, Apr. 6, 1984, 5 Iran-U.S. Claims Trib. Reports 251, 265. *See also id.* at 263 (emphasizing a "search for the real and effective nationality based on the facts of a case, instead of an approach relying on more formalistic criteria").

The fact-based approach also appears to be the accepted analysis among other international courts. *See, e.g.*, *Mergé Case (U.S. v. Italy)*, 14 R.I.A.A. 236, 247 (Italian-U.S. Conciliation Comm'n June 10, 1955) ("[H]abitual residence can be one of the criteria of evaluation [to determine effective nationality], but not the only one. The conduct of the individual in his economic, social, political, civic and

family life, as well as the closer and more effective bond with one of the two [s]tates must also be considered."); *Nottebohm Case (Liechtenstein v. Guatemala)*, 1955 I.C.J. 4, 22–23 (Apr. 6, 1955) (describing a "prevailing tendency [ ] to prefer the real and effective nationality" and listing several factors for determination); *Drummond's Case* [1834] 12 Eng. Rep. 492, 500 (P.C.) (concluding that Mr. Drummond "was technically a British subject, . . . yet, he was also, at the same time, in form and substance, a French subject, domiciled in France, with all the marks and attributes of French character," and, therefore, a seizure of his property by the French government was "in the exercise of its municipal authority over its own subjects"). *See generally* Kim Rubenstein and Daniel Adler, *International Citizenship: The Future of Nationality in A Globalized World*, 7 Ind. J. Global Legal Stud. 519, 536–37 (2000) (discussing international courts' approaches to dual nationality).

We have described the related determination of a party's residency as "a fact-sensitive issue." *Comm'r. v. Estate of Sanders*, 834 F.3d 1269, 1279 (11th Cir. 2016) (considering bona fide residency for tax purposes). The same is true for the concept of domicile. *See Sunseri v. Macro Cellular Partners*, 412 F.3d 1247, 1249 (11th Cir. 2005) ("This Court reviews the district court's findings regarding domicile under a clearly erroneous standard."). Having supplied the dual nationality framework, we remand the question of its application to Julio "because

the [d]istrict [c]ourt is in the best position to review all the facts and conduct the inquiry now required." *Local 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1259 (11th Cir. 2014). In answering the question, the district court should consider (and the parties may dispute) the threshold questions of whether Julio is in fact a citizen of both Italy and Venezuela. Our statements in this opinion are not meant as conclusive determinations.

## VI.  THE PRESUMPTION AGAINST EXTRATERRITORIALITY

Venezuela and Pequiven rely upon a series of Supreme Court cases establishing a presumption against extraterritoriality—"when a statute gives no clear indication of an extraterritorial application, it has none." *Kiobel*, 569 U.S. at 115 (quoting *Morrison v. Nat'l Australia Bank. Ltd.*, 561 U.S. 247, 248 (2010)). Under *Kiobel* and *Morrison*, our task is to "ask whether the presumption against extraterritoriality has been rebutted—that is, whether the statute gives a clear, affirmative indication that it applies extraterritorially."  *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016).

According to Venezuela and Pequiven, the FSIA "expropriation exception does not have extraterritorial effect if there is no connection whatsoever to the United States." Br. of Pequiven at 21. This may be true, but the argument ignores that the expropriation exception contains a nexus requirement providing a requisite connection to the United States sufficient to allow extraterritorial application. *See*

22

§ 1605(a)(3) (requiring "that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States").  The expropriation exception focuses on the connection of the property in question (or any property exchanged for that property) to the United States.  *See id.*  Congress explicitly noted that the expropriated property itself "need not be present" in the United States, so long as the agency or instrumentality of the foreign state owns or operates it (or property exchanged for it) and is engaged in commercial activity in the United States.  *See* H.R. Rep. 94-1487, at 19 (1976).  If a plaintiff satisfies this requirement, that is enough to permit exterritorial application.  *See Verlinden*, 461 U.S. at 490–91 ("If an action satisfies the substantive standards of the [FSIA], it may be brought in federal court regardless of the citizenship of the plaintiff.").  We cannot, as Venezuela and Pequiven apparently urge, engraft additional requirements onto those which Congress has already decreed.  *See Silva-Hernandez v. U.S. Bureau of Citizenship & Immigr. Servs.*, 701 F.3d 356, 361 (11th Cir. 2012) ("[C]ourts have no authority to alter statutory language. We cannot add to the terms of the provision what Congress left out.") (alteration omitted); *Friends of the Everglades*

23

*v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1224 (11th Cir. 2009) ("[W]e are not allowed to add or subtract words from a statute; we cannot rewrite it.").

Assuming the Comparellis are able to satisfy the necessary nexus to the United States, this case mirrors the situation described in *RJR Nabisco*, which held that the presumption against extraterritoriality was rebutted for certain applications of the federal RICO statute.  There, the Supreme Court noted "that RICO defines racketeering activity to include a number of predicates that plainly apply to at least some foreign conduct."  *RJR Nabisco*, 136 S. Ct. at 2101.  For example, the prohibition against hostage taking includes conduct that occurred outside the United States, provided that "the offender or the person seized or detained is a national of the United States," "the offender is found in the United States," or "the governmental organization sought to be compelled is the Government of the United States."  *See* 18 U.S.C. § 1203(b)(1); *RJR Nabisco*, 136 S. Ct. at 2101–02.  In other words, like the FSIA expropriation exception, the RICO statute as applied to exterritorial hostage takings ensured a specific nexus to the United States.  That nexus requirement was enough to rebut the presumption against extraterritoriality in *RJR Nabisco*, and we hold that the nexus requirement of § 1605(a)(3) similarly rebuts that presumption here.

*Amerada Hess* does not counsel otherwise.  There, two Liberian corporations sued the Argentine Republic in federal court seeking to recover

24

damages stemming from the alleged bombing of their oil tanker in the South Atlantic, about 600 miles off the coast of Argentina. *See Amerada Hess*, 488 U.S. at 431. The corporations argued that jurisdiction was appropriate under § 1605(a)(5), the FSIA exception for non-commercial torts. *See id.* at 439. The Supreme Court held that the exception did not apply because it was "limited by its terms [ ] to those cases in which the damage to or loss of property occurs *in the United States*." *Id.* (emphasis in original). The companies argued that the bombing occurred "in the United States" because the FSIA defined the United States to include all "territory and waters, continental and insular, subject to the jurisdiction of the United States," including the high seas, which are within its admiralty jurisdiction. *See id.* at 440 (quoting 28 U.S.C. § 1603). The Supreme Court, however, rejected this interpretation of "United States" to include the bombing over 5,000 miles from the United States coast due to "the canon of construction which teaches that legislation of Congress, unless contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *See id.* at 440–41.

The expropriation exception does not contain the same limiting language as the non-commercial tort exception addressed in *Amerada Hess*. Rather, § 1605(a)(3) contemplates suits regarding exterritorial takings so long as the nexus requirement in the exception is satisfied. In fact, in *Amerada Hess*, the Supreme

25

Court specifically distinguished the commercial activity exception, § 1605(a)(2), from the non-commercial tort exception, § 1605(a)(5).  It explained that under the commercial activity exception, "a foreign state may be liable for its commercial activities 'outside the territory of the United States' having a 'direct effect' inside the United States."  *Amerada Hess*, 488 U.S. at 441.  We see no reason to treat the expropriation exception differently.  So long as the nexus requirement is met, § 1605(a)(3) may apply to an extraterritorial taking in violation of international law of property belonging to individuals who are not United States nationals.  *See Verlinden*, 461 U.S. at 490–91 (noting that Congress did not restrict "the class of potential plaintiffs," but instead "enact[ed] substantive provisions requiring some form of substantial contact with the United States"); *Cassirer v. Kingdom of Spain*, 616 F.3d 1019, 1028 (9th Cir. 2010) ("[W]e understand that Congress meant for jurisdiction to exist over claims against a foreign state whenever property that its instrumentality ends up claiming to own had been taken in violation of international law, so long as the instrumentality engages in a commercial activity in the United States.").  Put differently, the nexus requirement in § 1605(a)(3)  is the "connection . . . to the United States," Br. of Pequiven at 21, that Congress has mandated for extraterritorial application.

Whether or not the Comparellis have actually satisfied the nexus requirement is another matter.  They allege that Pequiven is an agency or

instrumentality of Venezuela and that it engages in commercial activity in the United States. But, as *Helmerich* dictates, the district court will need determine on remand whether the nexus requirement is, in fact, established; mere allegations are no longer sufficient. *See Helmerich*, 137 S. Ct. at 1316. All we hold today is that, assuming the statutory nexus to the United States is satisfied, the expropriation exception may apply to an extraterritorial taking of property belonging to foreign nationals.

## VII. WHETHER THE COMPARELLIS SATISFIED THE EXPROPRIATION EXCEPTION

Because the domestic takings rule does not appear to bar Carmina's claim (and may not bar Julio's claim), we next must determine whether the expropriation exception is satisfied. Again, this exception requires a showing that (1) rights in property are at issue; (2) the property was taken; (3) the taking was in violation of international law; and (4) at least one of the two statutory nexus requirements are satisfied. *See* § 1605(a)(3).

Not surprisingly, the parties dispute whether this standard has been met. But they and the district court lacked the benefit of *Helmerich*. Although the parties' briefs on appeal discuss how § 1605(a)(3) applies to the facts of this case, the parties below submitted only limited evidence and the district court made no factual findings resolving any of the now-critical disputes. This leaves us with several matters that the record simply does not answer.

27

For example, under the third prong of the exception, there are three ways in which a taking may violate international law: (1) when it does not serve a public purpose; (2) when it discriminates against those who are not nationals of the country; or (3) when it is not accompanied by provision for just compensation. *See Chettri v. Nepal Rastra Bank*, 834 F.3d 50, 58 (2d Cir. 2016); *Cassirer*, 616 F.3d at 1027. *See also* Restatement (Third) of Foreign Relations § 712 (listing these three manners); H.R. Rep. 94-1487, at 19–20 (1976) (a taking violates international law if it is done "without payment of the prompt adequate and effective compensation required by international law" or is "arbitrary or discriminatory in nature").[6]

Here, the purpose of the alleged expropriation is hotly contested. *See Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 712 (9th Cir. 1992) (considering allegations that "Argentina officials seized INOSA for their personal profit and not for any public purpose"). And there is no finding as to whether it was done with a discriminatory motive. *See id*. at 712 (considering allegation that Argentina targeted the plaintiffs because they were Jewish); Restatement (Third) of Foreign Relations § 712 cmt. f (noting that "a program of taking that singles out

---

[6] These requirements are subject to the domestic takings rule. As noted, "when a foreign nation confiscates the property of its own nationals, it does not implicate principles of international law." *FOGADE*, 263 F.3d at 1294.

 The Comparellis have alleged numerous treaty violations as sufficient to satisfy the "violation of international law" requirement of the expropriation exception. But "the Eleventh Circuit has never held that the exception to sovereign immunity set out in 28 U.S.C. § 1605(a)(3) is triggered by human rights treaty-based allegations." *Mezerhane*, 785 F.3d at 549. And, as in *Mezerhane*, "we decline to do so here." *Id*.

aliens generally, or aliens of a particular nationality, or particular aliens, would violate international law"). *But cf. Helmerich & Payne Int'l Drilling Co. v. Bolivarian Republic of Venezuela*, 784 F.3d 804, 813–14 (D.C. Cir. 2015) (discrimination "'implies unreasonable distinction,' and so 'takings that invidiously single out property of persons of a particular nationality would be discriminatory,' whereas 'classifications, even if based on nationality, that are rationally related to the state's security or economic policies might not be [discriminatory]' and thus not in violation of international law") (citing Restatement (Third) of Foreign Relations § 712) (alterations omitted), *vacated and remanded*, 137 S. Ct. 1312 (2017).[7]

We also lack any information about what compensation, if any, would be required under the circumstances. *Compare Chettri*, 834 F.3d at 58 (freezing of assets under "routine law enforcement action" did not constitute a violation of international law), *with Siderman de Blake*, 965 F.2d at 712 (allegation that the plaintiffs did not "receive[ ] any compensation for the seizure, let alone just compensation" stated a claim for a violation of international law) (emphasis removed). And, finally, the record does not explain and the district court understandably did not consider what remedies are available in Venezuela, whether

---

[7] That Marivelca is a Venezuelan corporation is not necessarily dispositive. A court may consider whether "a foreign state treats a corporation in a particular way because of the nationality of its shareholders." *Banco Nacional de Cuba v. Farr*, 383 F.2d 166, 185 (2d Cir. 1967) (noting that Cuban expropriation of corporation occurred "because it was largely owned by nationals of the United States of North America").

the Comparellis exhausted them, or whether any such remedies are inadequate so that any failure to exhaust them should be excused. *See Altmann*, 541 U.S. at 714 (Breyer, J. concurring) ("[A] plaintiff may have to show an absence of remedies in the foreign country sufficient to compensate for any taking."); *Abelesz v. Magyar Nemzeti Bank*, 692 F.3d 661, 679–85 (7th Cir. 2012) (detailing a "well-established rule of customary international law" that available remedies must be exhausted for a taking to violate international law, unless "there is a legally compelling reason for plaintiffs' failure to exhaust [ ] remedies," such as when those remedies are "barred by inaction or hostility" by the foreign state).

These are just some of the issues that must be addressed to determine whether the expropriation exception is satisfied. In this scenario, with *Helmerich* having been issued after the case was on appeal, we believe it is appropriate to remand and have the district court determine in the first instance whether jurisdiction exists under § 1605(a)(3) of the FSIA. *See Marsteller ex rel. United States v. Tilton*, 880 F.3d 1302, 1315 (11th Cir. 2018) (remanding case in light of an intervening Supreme Court opinion, including for consideration of whether to allow the plaintiffs to file a second amended complaint); *Miller v. King*, 449 F.3d 1149, 1151 (11th Cir. 2006) (concluding that, in light of an intervening Supreme Court decision, "th[e] case should be remanded to the district court for Miller to amend his complaint so that the proper [ ] analysis can be undertaken."). Because

30

*Helmerich* heightened the proof required of the Comparellis to establish jurisdiction under the expropriation exception of the FSIA, they should be allowed to amend their complaint. *See* Fed. R. Civ. P. 15; *Miller*, 449 F.3d at 1151. And Venezuela and Pequiven should, of course, be allowed to respond to the amended complaint as they see fit.

## VIII.  REASSIGNMENT TO ANOTHER DISTRICT JUDGE

Because we are remanding the case to the district court, we must consider the Comparellis' request that we direct the case to be reassigned to a different district judge pursuant to 28 U.S.C. § 2106. Reassignment is a "severe remedy," *Stargel v. SunTrust Banks, Inc.*, 791 F.3d 1309, 1311 (11th Cir. 2015), and only "appropriate where the trial judge has engaged in conduct that gives rise to the appearance of impropriety or a lack of impartiality in the mind of a reasonable member of the public." *United States v. Torkington*, 874 F.2d 1441, 1446 (11th Cir. 1989). Where, as here, there is no indication of actual bias, we apply a three factor test from *Torkington*, considering "(1) whether the original judge would have difficulty putting [her] previous views and findings aside; (2) whether reassignment is appropriate to preserve the appearance of justice; [and] (3) whether reassignment would entail waste and duplication out of proportion to gains realized from reassignment." *Id*. at 1447.

31

No factor supports reassignment in this case.  The Comparellis explain that their "reasonable belief is grounded on a pattern of adverse rulings," Br. of Carmina and Julio Comparelli at 52, but "the fact that the district judge ruled against the appellants previously is of little impact; otherwise every reversed case would have to be reassigned on remand."  *Stargel*, 791 F.3d at 1312.  We are confident that the experienced and able district judge will fairly and impartially adjudicate this dispute on remand.  Nothing whatsoever in the record leads us to believe otherwise.

## IX. CONCLUSION

We reverse the dismissal of the Comparellis' complaint.  On remand, the district court should permit the Comparellis to file an amended complaint and, after Venezuela and Pequiven have responded, address whether the domestic takings rule applies and whether jurisdiction exists under the FSIA's expropriation exception.  Jurisdictional discovery and the presentation of evidence may be required, but we leave those matters in the discretion of the district court.  *See Helmerich*, 137 S. Ct. at 1316–17.

"We recognize that merits and jurisdiction will sometimes come intertwined."  *Id*. at 1319.  If, on remand, the district court's resolution of the jurisdictional questions under *Helmerich* requires it to "inevitably decide some, or all, of the merits issues, so be it."  *Id*.

32

**REVERSED AND REMANDED.**