[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 21-13276

Non-Argument Calendar

_____

EILEEN AGURCIA,
MARCO AGURCIA,
REGINA ANDERSON,
HUGH ANDERSON,
ANTIQUARE INTERNATIONAL, LTD, et al.,

Plaintiffs-Appellants,

versus

REPUBLICA DE HONDURAS,
INSTITUTODE LA PROPIEDAD,
EMPRESA NACIONAL DE ENERGIA ELECTRICA,

Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 8:19-cv-00038-TPB-SPF

———————————————

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

PER CURIAM:

A group of nearly 100 U.S. citizen investors in a mixed-use development located in Honduras sued the government of Honduras and two state-run entities after squatters took over the land surrounding the development and effectively shut down the project. The plaintiffs claim that, by allowing the squatters to occupy the land and devalue their investment, the government of Honduras has expropriated their property in violation of international law. The district court disagreed and dismissed the case for lack of subject-matter jurisdiction under the Foreign Sovereign Immunities Act ("FSIA"). In the court's view, the plaintiffs failed to show that the FSIA's expropriation exception applied for two independent reasons: (a) the plaintiffs' property rights were not "taken in violation of international law,"; and (b) the defendants did not "engage[] in commercial activity in the United States." *See* 28 U.S.C. § 1605(a)(3). The plaintiffs challenge both rulings on appeal.

After careful review, we conclude that the plaintiffs have failed to show a taking of their property by Honduras within the meaning of the expropriation exception. We affirm on that ground, and do not address whether there is a sufficient commercial nexus to the United States.

## I.

We take the following factual allegations from the plaintiffs' amended complaint. The individual plaintiffs are U.S. citizen investors in the Honduras Development Project (the "Project"), conceived as a mixed-use development project located in San Pedro Sula, a city in northwest Honduras.[1] The Project consisted of a residential development of roughly 420 homes, and a commercial development offering office, retail, and meeting spaces. By 2012, after rounds of financing and detailed planning, the Project had begun constructing and selling homes for the residential development. An appraisal of the land and its improvements from 2012 revealed that the value of the investors' stock had doubled.

In March 2012, however, a group of squatters "overran the lands surrounding" the site of the Project, building roads and makeshift structures that would come to support a population of "thousands." The squatters were led by a nongovernmental

---

[1] According to the amended complaint, the individual plaintiffs were "hardworking Americans," ranging in age from 18 to 85 and hailing from all over the country, and sometimes overseas, who "invested most, if not all, of their retirement savings into the Honduras Development Project."

organization, the Confederación Nacional de Federaciones de Patronatos de Honduras ("Conafeph"), which advocates for the expropriation and transfer of private property to low-income individuals throughout Honduras.  On one occasion, the squatters occupied a main highway, blocking access into or out of the Project for several days.  The squatters also filed petitions to formally expropriate the land they were occupying—the privately-owned land surrounding the Project—on grounds of public need, and otherwise slowed development at the Project.  These petitions were denied, but no action has been taken to remove the squatters.

Home sales in the Project plummeted because of the squatters' presence and "the increase in crime and violence that followed" their arrival.  As a result, the Project came to a standstill.  Of the 420 houses planned as part of the residential development, only around 100 were sold, and nearly half of those were forfeited for non-payment.  The commercial development phase did not move beyond some initial improvements.

The government of Honduras has supported the squatters, according to the plaintiffs, despite earlier promises to foreign investors that the country was "open for business."  The national power company, Empresa Nacional de Energia Electrica ("Power Company"), has failed to do anything about the squatters' illegal electrical connections and refusal to pay for electrical services.  In addition, officials with the Instituto de la Propiedad ("Property Institute")—the government subdivision broadly responsible for, among other things, resolving conflicts regarding title to and

possession of real property—backed the squatters' expropriation petitions and falsely claimed that the Project had failed to submit proper development plans. Then, in 2015, the local government authority in San Pedro Sula announced its intention to rezone the lands occupied by the Project for low-income housing. The amended complaint also alleges that, "As part of the coordinated effort between the Honduran Government Defendants and the squatters, Plaintiffs believe that key documents regarding their ownership of the lands at issue have been removed from official land records, or otherwise altered." The complaint gives no factual grounds for this belief, however.

In April 2018, representatives for the plaintiffs and the government of Honduras met to discuss issues related to the Project. During that meeting, the government representative "acknowledged that the squatters had taken the lands at issue" and pledged to "rectify the situation." While his proposed resolutions were "insufficient," according to the plaintiffs, they "confirmed Defendant Republic of Honduras' recognition that it had worked an expropriation" by allowing the squatters' actions. When the meeting ended, the government representative stated that he would arrange for a follow-up meeting with key government officials. Since then, though, the government of Honduras has not replied to the plaintiffs.

## II.

In January 2019, the plaintiffs—nearly 100 individual U.S. citizen investors and a few companies—filed their initial complaint in

federal court against the government of Honduras, the Property Institute, and the Power Company (collectively, "Honduras"), alleging a taking in violation of international law, conversion, and civil conspiracy. The plaintiffs maintained that Honduras was subject to suit in the United States because it had expropriated their property within the meaning of the expropriation exception to FSIA's general grant of sovereign immunity. *See* 28 U.S.C. § 1605(a)(3).[2] Honduras did so, according to the complaint, by "allow[ing] thousands of squatters to take over the privately-owned lands surrounding the Honduras Development Project," which stopped development of the project and devalued its assets significantly.

Honduras filed a motion to dismiss for lack of jurisdiction, which the district court granted after a period of limited jurisdictional discovery. While the court found that the plaintiffs had a protected property interest in their investments in the Project, it concluded that the plaintiffs failed to demonstrate a taking of that property in violation of international law. The court explained that a "taking in violation of international law" means "the nationalization or expropriation of property without payment," or some "action by a government to acquire property for itself, as in the

---

[2] As relevant here, 28 U.S.C. § 1605(a)(3) provides that a foreign state is not immune from the jurisdiction of courts in the United States "in any case in which rights in property taken in violation of international law are in issue[,] and that property . . . is owned or operated by an agency or instrumentality of the foreign state . . . engaged in a commercial activity in the United States."

exercise of eminent domain." But, in the court's view, the plaintiffs failed to show that "their rights in their investments have been nationalized" or to cite any "legal authority showing Defendants' actions (or inactions) here constitute expropriation of their investment."

The district court also found that the expropriation exception did not apply for another reason: Honduras did not engage in commercial activity in the United States. The court stated that the plaintiffs identified "only one commercial activity," a 2011 conference hosted in Honduras to encourage foreign investment in the country. But this conference was insufficient to establish a sufficient commercial nexus, according to the court, because the "promotion of trade is not a commercial activity," and nothing in the record showed that Honduras "took steps *within* the United States to target investors."

In dismissing the complaint, the district court granted the plaintiffs leave to amend. The plaintiffs accepted the invitation and filed an amended complaint, but the district court concluded that it suffered from the same essential defects as the original complaint and dismissed the action. This appeal followed.

### III.

We review *de novo* questions of subject-matter jurisdiction, including whether a district court may exercise jurisdiction over a case under the FSIA's expropriation exception. *Comparelli v.*

*Republica Bolivariana de Venezuela*, 891 F.3d 1311, 1318, 1326–27 (11th Cir. 2018).

Ordinarily courts are limited to reviewing the face of the complaint when resolving a motion to dismiss. *Id.* at 1319. But "challenges to jurisdiction under the expropriation exception, like other factual challenges to subject-matter jurisdiction under Rule 12(b)(1), may be resolved by looking to material extrinsic from the pleadings, such as affidavits or testimony." *Id.* at 1319–20. Here, though, the jurisdictional question did not "turn upon further factual development." *Bolivarian Republic of Venezuela v. Helmerich & Payne Int'l Drilling Co.*, 137 S. Ct. 1312, 1316 (2017). The district court appears to have based its decision on the amended complaint's factual allegations, and the plaintiffs on appeal do not rely on any additional evidence. So we largely limit our review to the plaintiffs' factual allegations, which we accept as true for purposes of this appeal. *See Devengoechea v. Bolivarian Republic of Venezuela*, 889 F.3d 1213, 1220 (11th Cir. 2018).

## IV.

The FSIA provides, with specified exceptions, that a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States." 28 U.S.C. § 1604. One of the exceptions—the expropriation exception—says that a foreign state is not immune in any case "in which rights in property taken in violation of international law are in issue and that property . . . is owned or operated by an agency or instrumentality of the foreign

21-13276                Opinion of the Court                9

state . . . engaged in a commercial activity in the United States." 28 U.S.C. § 1605(a)(3).

A plaintiff seeking to invoke jurisdiction over a foreign state under the expropriation exception "must show (1) that rights in property are at issue; (2) that property was taken; (3) that the taking was in violation of international law; and (4) that at least one of the two statutory nexus requirements are satisfied." *Comparelli*, 891 F.3d at 1319, 1326. In other words, "the relevant factual allegations must make out a legally valid claim that a certain kind of right is at issue (property rights) and that the relevant property was taken in a certain way (in violation of international law)." *Helmerich*, 137 S. Ct. at 1316.

Under the FSIA, "expropriation is a uniquely sovereign act, as opposed to a private act." *Devengoechea*, 889 F.3d at 1228. "FSIA expropriation involves sovereign 'takings' of property, without just compensation." *Id.* So for the purposes of construing the FSIA and the expropriation exception, "expropriation refers to only the state's use of its sovereign power to take property." *Id.* at 1229. We applied these principles in *Devengoechea*, holding that the expropriation exception did not apply because the foreign state "did not invoke any of its sovereign powers" to obtain the plaintiff's property.

Here, the district court properly concluded that the plaintiffs failed to establish jurisdiction over Honduras under the expropriation exception. The plaintiffs have not demonstrated a taking of their property through an exercise of Honduras's sovereign power.

At the outset, we note that the plaintiffs do not identify with any precision the legal theory under which Honduras's actions allegedly constitute a taking. *See, e.g.*, *Cedar Point Nursery v. Hassid*, 141 S. Ct. 2063, 2071–72 (2021) (describing types of takings recognized in Fifth Amendment jurisprudence); *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 537–39 (2005) (same).

The plaintiffs do not appear to assert a physical taking. *See Cedar Point*, 141 S. Ct. at 2071. They did not allege any physical taking of or intrusion on the Project's land, either by the squatters or the government, apart from the squatters' blocking of highway access for several days and some criminal activity. Rather, it appears the Project has not been occupied and continues to be privately owned property. The only property occupied by the squatters is privately owned land adjacent to the Project, and nothing in the record suggests that the plaintiffs own or have any investments in that land.

While the plaintiffs accuse Honduras of "undermin[ing]" their property rights by supporting the squatters, they fall short of showing that this conduct culminated in a "taking" of their property. *See* 28 U.S.C. § 1605(a)(3); *Devengoechea*, 889 F.3d at 1228–29. The plaintiffs alleged that the Property Institute supported the squatters' expropriation petitions, but it appears those petitions concerned the occupied lands surrounding the Project, not the site of the Project itself, and the petitions were denied, so no expropriation ultimately occurred. Similarly, even if we assume it would constitute a taking had the local government rezoned lands

occupied by the Project, the plaintiffs do not suggest that the local government has moved forward with this plan since announcing its intentions in 2015.  In sum, we see no grounds to conclude that this conduct, though adverse to the plaintiffs, amounted to a taking.

Nor have the plaintiffs offered sufficient factual allegations to show the substantial equivalent of a regulatory taking.  *See Lingle*, 544 U.S. at 538–39.  The plaintiffs blame Honduras for devaluing their investment in the Project by failing to take action against the squatters, such as cutting off electrical service.  But they fail to explain how their "rights in [that investment]" were taken by the government, even assuming Honduras's failure to act affected the value of the investment negatively.  *See* 28 U.S.C. § 1605(a)(3).  They cite no authority to support their claim that the loss of value in their investment amounted to a taking under the FSIA.

Although a nonphysical taking can arise from government action that goes too far in interfering with legitimate property interests, *see Lingle*, 544 U.S. at 539–40, a mere diminution in value usually does not amount to a taking.  *See, e.g.*, *Penn Cent. Transp. Co. v. New York City*, 438 U.S. 104, 131 (1978) ("Appellants concede that the decisions sustaining other land-use regulations . . . uniformly reject the proposition that diminution in property value, standing alone, can establish a 'taking' . . ."); *Baytree of Inverrary Realty Partners v. Lauderhill*, 873 F.2d 1407, 1410 (11th Cir. 1989) ("Neither deprivation of the most beneficial use of land, nor a severe decrease in the value of property, measures up to an unlawful

taking.").  And the plaintiffs do not identify any circumstances here that would warrant a departure from that norm.

Not only that, but to the extent the plaintiffs have established a severe intrusion on their property interests, we cannot, on this record, attribute that intrusion to an exercise of Honduras's sovereign power.  According to the amended complaint, the squatters were led by Conafeph, a nongovernmental organization.  And there are no factual allegations reflecting communication or coordination between Conafeph or the squatters and the government.  At best, the amended complaint vaguely hints at a conspiracy to alter property records: "As part of the coordinated effort between the Honduran Government Defendants and the squatters, Plaintiffs believe that key documents regarding their ownership of the lands at issue have been removed from official land records, or otherwise altered."  But the record lacks any allegations to support this conclusory accusation, including, for example, who altered the records, in what ways, or what "coordinat[ion]" was involved.  *Cf. Oxford Asset Mgmt., Ltd. v. Jaharis*, 297 F.3d 1182, 1188 (11th Cir. 2002) ("[C]onclusory allegations, unwarranted deductions of facts or legal conclusions masquerading as facts will not prevent dismissal.").  The plaintiffs' belief alone is insufficient to impute the squatters' conduct to the government of Honduras.

Finally, we are not persuaded that Honduras has "acknowledged that a taking occurred," as the plaintiffs claim.  The amended complaint alleges that, at the April 2018 meeting, a government representative "acknowledged that the squatters had taken the

lands at issue"—that is, the lands surrounding the Project, the only lands allegedly occupied by the squatters—and "pledged the support of [Honduras] to rectify the situation," raising several potential resolutions. The pleading then assumes that these proposed resolutions "confirmed [Honduras's] recognition that it had worked an expropriation." But without any further details about the representative's comments, we cannot tell whether the plaintiffs' inference is reasonable or even plausible—especially because the statement attributed to the representative refers to only the lands surrounding the Project, not the lands of the Project itself.

Regardless, "calling an action expropriation does not make it expropriation as a matter of law." *Devengoechea*, 889 F.3d at 1230. Rather, "FSIA expropriation has a very precise meaning." *Id.* And to establish jurisdiction under the FSIA, the plaintiffs must show to the court that Honduras's actions satisfy that precise meaning. *See id.* ("FSIA expropriation has a very precise meaning, and on this record, Venezuela's actions do not satisfy it."); *Helmerich*, 137 S. Ct. at 1316. But as we just explained, the plaintiffs' factual allegations are insufficient to show that their property rights were taken through an exercise of Honduras's sovereign power, as required to exercise jurisdiction under § 1605(a)(3). *See Devengoechea*, 889 F.3d at 1228–29.

For these reasons, we affirm the district court's dismissal of the plaintiffs' claims for lack of subject-matter jurisdiction under the FSIA.

**AFFIRMED.**